HUNNICUTT v. PEYTON.

1. Exceptions reserved at the trial of the cause may, within such time thereafter during the term as the judge shall deem reasonable, be reduced to form and presented to him for signature, and they are not waived by suing out a writ of error before his signature is obtained.

2. Where, under such circumstances, bills of exceptions are signed during the term, it is not necessary to render them effective that they be antedated, or ordered to be filed *nunc pro tunc*, as of a time during the trial.

3. A party who, under article 24 of the Mexican law of 1825, procured from the government, by purchase, a grant of public lands, could alienate it before they were selected; and his formal act of sale, with a power to his alienee to obtain the title of possession, constituted the latter the absolute owner of them, when he, by the proper officer, was furnished with the evidence of title and put in possession. Where, therefore, the grant contained no specific description of the lands, but contemplated the selection and location of them, the title of extension, when given to the alienee, is complete.

4. In questions of private boundary, the declaration of a deceased person of particular facts, as distinguished from reputation, is not admissible unless it be shown that he had knowledge of that whereof he spoke, and was then on the land, or in possession of it, and was pointing out and marking the boundary, or discharging some duty in relation thereto. A declaration, merely reciting something past, is within the rule which excludes hearsay evidence.

5. The decisions of the Supreme Court of Texas examined and *held* to be in harmony with this ruling.

6. The possession of a person who, under color of title, enters upon vacant lands, and holds adversely, is construed to include so much as is within the boundaries of his title, and to that extent the true owner will be deemed to be disseised. But if the latter be in actual possession of any part of the lands whereon the entry is made, his constructive seisin extends to all not in fact occupied by the intruder.

ERROR to the Circuit Court of the United States for the Western District of Texas.

This was an action brought by Bailie Peyton and others against Hunnicutt and others to recover possession of a tract of land in the county of Falls, Texas, being "four leagues of land on the east of left bank of the Brazos River, known as the Gregorio Basquez survey of four leagues," and more particularly described in the amended petition as beginning at a stake marked "P" on the east bank of the river Brazos, in the county of Falls, State of Texas, at the point where the upper line of the Austin & Williams reserve, on the east side of said river, intersects said river; running thence with said upper

line of the reserve ᴧ. 71° E. 20,220 varas to a stake, and crossing Isaac's Creek; thence S. 19° E. 5,000 varas to another stake for the third corner; thence S. 71° W. 18,320 varas, covering again the aforesaid creek to a stake on the Brazos River for the fourth corner; thence up said river to the place of beginning, covering an area of four leagues, fronting on said river and lying within said Austin & Williams reserve, immediately below and adjoining said upper line of said reserve.

The defendants pleaded the general issue and the Statute of Limitations. Sundry exceptions were taken during the trial. The jury returned a verdict for the plaintiffs, on which judgment was rendered. The defendants sued out this writ.

They assign for error that the court erred, —

I. In admitting the documentary evidence set out in their bill of exceptions, being certified copies of certain papers, and in holding that they vested a legal title in Jonathan C. Peyton. The copies are as follows, the plaintiffs offering in evidence the original *testimonio* of their title: —

"*First*, A power of attorney, with power of substitution, from Gregorio Basquez to Jayme Hartz, dated the twentieth day of September, eighteen hundred and thirty-one (1831).

"*Power of Attorney, with Power of Substitution, from Gregorio Basquez to Jayme Hartz.*

"Second stamp — twelve reales.

"Legalized for the State of Coahuila and Texas for the years 1828, '29, '30, & '31.

"By commission:                         "JESUS DE LOS SANTOS COY.

"In the town of Nacogdoches, on the twentieth day of September, 1831, before me, the citizen Manuel de los Santos Coy, sole constitutional alcalde of the aforesaid town, and instrumental witnesses hereinafter named, besides those of my assistants with whom I act agreeably to the law, appears the citizen Gregorio Basquez, of this jurisdiction, in his proper person, whom I declare to know, and who says: That by these presents he executes, gives, and confers all his power, full, ample, and sufficient, whatever may be required by law and is necessary or may be of value, to Don Jayme Hartz, of this jurisdiction special, that he, in representations and use of the rights and interests which pertain to the grantor,

may solicit of the person or persons authorized to that effect, the possession and titles of eleven leagues of land, which he has obtained from the supreme government of the State by way of purchase, with the authority to empower him to solicit in the place or places which best suits him, together or separate, according to the tenor of the concession of the date of 11th March of this year, which I declare to have seen.

"And the grantor has placed in the hands of his attorney that he may do and perform, in the name of the grantor, all whatsoever he might do were he actually present, since for all as aforesaid, annexed, concerning, incident, and pertaining, he gives and confers the most ample and extensive power, without any limitation whatever, and without which, by default of any clause or requisite, he gives to this power all the force and effect, whatever the same may be, as if the same was herein literally written and inserted.

"That he may appoint substitutes, revoke the same and appoint others anew, with free, frank, and general administration in form, since for all he relinquishes by this act whatever the law permits, and acknowledges all whatsoever his attorney may do or perform by virtue of this power of attorney, binding his person and property in every form, and renounces all laws in his favor.

"In testimony whereof thus he executes, as he does not know how to write, he makes the sign of the cross; there were present, as instrumental witnesses, the citizens Martin Ybarvo, Antonio. Menchaca, and Carlos Gil, residents of this town, and those of my assistants in the form prescribed by law, to which I certify.

"MANUEL DE LOS SANTOS COY.

"Sign of the cross of —

"GREGORIO BASQUEZ. ✛

"Ass. witness: JESUS DE LOS SANTOS COY.

"Ass. witness: VITAL FLORES.

"This *testimonio* agrees with the original which remains in the archive of the public documents of this municipality, which goes truly and legally compared and corrected, and at its transcribing, correction, and comparing the same, there was found the same instrumental witnesses who were present at its execution, besides those of my assistants, with whom I act in the form prescribed by law, to which I certify.

"MANUEL DE LOS SANTOS COY.

"Ass. witness: JESUS DE LOS SANTOS COY.

"Ass. witness: VITAL FLORES."

" *Second,* An act of sale by Gregorio Basquez to the said Jayme Hartz of his concession in sale, which had been made to him by Santiago del Valle, on the eleventh day of March, eighteen hundred and thirty-one (1831), bearing date Sept. 22, eighteen hundred and thirty-one (1831).

### " *Act of Sale, Basquez to Hartz.*

" Third stamp — two reales. [STAMP.] For the years 1830 and 1831.

" MOST EXCELLENT SIR, — Gregorio Basquez, a native of the city of Mexico, and now residing in this town, with the due respect to your excellency I would represent, that understanding the provisions of the twenty-fourth article of the colonization law of the State, of 24th March, 1825, and in virtue of being a native Mexican, with due respect to your excellency, I pray you be pleased to grant me in sale eleven leagues of land on the vacant territory of this department, with the privilege of selecting them together or separate, or in distinct places, as may suit me, with the understanding that I offer to settle and cultivate them as customary, that it may be to the purpose within the term which the law prescribes, making the payments of its value on the terms and at the places designated in the twenty-second article, and to sustain the right of the country, and of the State, and all other that may be in conformity with the laws which govern us and under their protection.

" I pray your excellency be pleased to do as aforesaid, in which I will receive favor.

" NACOGDOCHES, Sept. 28, 1830.

" GREGORIO BASQUEZ.

" LEONA VICARIO, March 11, 1831.

" In conformity with the twenty-fourth article of the colonization law of 24th March, 1825, I grant by sale to the petitioner the eleven leagues of land that he solicits on the vacant territory of the State at the place that may best suit him, after the commissioner of the supreme general government shall have set apart a sufficiency of land for the payment of the debt due by the State to the Federation. The commissioner for the partition of land in the enterprise to which pertain the land solicited by the petitioner, and in his default, or that the same not being embraced by any enterprise whatever, the first or sole alcalde of the respective jurisdiction will comply with the orders on the subject and put him in possession of said leagues, and issue the proper title, previously classifying the quality of them; for according to their designation he shall satisfy

the State, for the payment of which I concede him the times designated in the twenty-second article of the aforesaid law.

"Let a copy of his petition and this decree be given by the secretary of state to the interested party, so that upon application with it to the commissioner it may have the desired effect.

"Letona.

"Santiago del Valle, *Secretary.*

"A copy of the original on file in the archives of the office of the secretary of state, in my charge, from whence it was taken by orders of his excellency the governor.

"Leona Vicario, March 14, 1831.

"Santiago del Valle, *Sec'y.*

"Second seal — twelve reales.

"Furnished for the State of Coahuila and Texas, for the terms 1828 and '29.

"By the commissioner,

"Jesus de los Santos Coy.

"In the town of Nacogdoches, the twenty-second day of the month of September, 1831, before me, citizen named de los Santos Coy, sole constitutional alcalde of the said town, and the instrumental witnesses, whose names appear at the end of this document, assisting me to authenticate the same in the absence of a notary appointed conformably to law, appeared the citizen Gregorio Basquez, of this district, in whom I placed confidence and with whom I am personally acquainted, and said that embracing the right which the twenty-seventh article of the colonization law of the State of the 24th of March, 1825, gives him, he applies for the present order of sale by which he has sold really and publicly in fee and for ever Don Jayme Hartz of this vicinity, as follows: —

"A grant of the supreme government of the State dated 11th of March, of the present year, of eleven leagues of land located on the public domain in this department, which was sold him by virtue of the twenty-fourth article of the colonization law above cited, with the same conditions, privileges, and obligations which were imposed upon the petitioner for whose possession and title he has granted a special power to the same purchaser, dated the 20th of the present month and the term of our Lord already given, for the price and sum of one hundred and fifty dollars, which he acknowledges having received in current coin to his satisfaction, wherefore he renounces the laws of *non numerata pecunia no entrego e prueba,* it

being an express condition that the purchaser shall pay the costs of the surveyor, commissioner, paper, sealing, enrolling of the titles, and the claims of the State for the usual price of the lands conformably to its quality, and for all the legal charges that may be considered as an augmentation of the price mentioned above in the sale by the said commissioner, and declared that this is the just value of the said lands; but if they are worth more he makes a surplus and remainder, a pure, more perfect, and irrevocable gift and donation to the purchaser and surrenders the right called *inter vivos ;* and for the security and surety of this sale he pledges the personal property that he now has or may have, and with it he submits himself to the law and jurisdiction of the judges and justices of the State, and particularly to those in this town, to whom he gives the same competency for exercising every right and executive obligation as if their decrees were authoritative judicial decrees. He renounces his proper judicial domicile and vicinity, the law *si cum . . . de jurisdictione omnium judicum* with the ['general'] of the right in respect to form.

"In testimony of which, as the petitioner was not able to write, he made a cross, the citizens Martine Ubarvo, Antonio Menchaca, and Charles Gil, present and living in the said town, instrumental witnesses with myself and those assisting me in the form prescribed according to law, to which I hereby certify.

           "MANUEL DE LOS SANTOS COY.

"Sign of the cross of—

           "GREGORIO BASQUEZ. +

"De asistencia: JESUS DE LOS SANTOS COY.

"De asistencia: VITAL FLORES.

"I have compared this testimonial with its original, which is placed in the archives of the public instruments of this municipality, and which is faithfully and legally corrected and compared, and at the copying, correcting, and comparing of which were present as instrumental witnesses the same as are attached to this grant, besides those assisting me authenticating in the form prescribed by law, to which I certify.

           "MANUEL DE LOS SANTOS COY.

"De asistencia: JESUS DE LOS SANTOS COY.

"De asistencia: VITAL FLORES."

"*Third,* A substitution of Jonathan C. Peyton by Jayme Hartz, to be the attorney of Gregorio Basquez, bearing date March 2 (1832), eighteen hundred and thirty-two.

"In the town of San Felipe de Austin, on the second day of March, 1832, before me the citizen Horatio Chriesman, first alcalde of the municipality, and witness Jayme Hartz, a resident of Nacogdoches, exercising the authority conferred on him by the preceding power of attorney, consents to substitute it in all and for all, on Jonathan C. Peyton, of this jurisdiction, to whom he relinquishes and accordingly does relinquish, binding the property bounden in said power of attorney, and agreeing to the substitution in form and signs it, whom I declare to know, there being as witnesses Don Amos Gates and Samuel Gates, residents of this colony.

"HORATIO CHRIESMAN.

"Ass. witness: FRANCIS ADAMS.
"Ass. witness: HYMAN HERTZ.
"OLIVER JONES."

"*Fourth*, An act of sale of the concession of Basquez, by Jayme Hartz to Jonathan C. Peyton, bearing date March 2 (1832), eighteen hundred and thirty-two:

"*Sello segundo — doce reales.*

"Furnished for the State of Coahuila and Texas for the terms 1828 and '29, '30, and '31.

"WILLIAMS.

"In the town of San Felipe de Austin, 2d of March, 1832, before me, the citizen Horatio Chriesman, first alcalde for this municipality, and the instrumental witnesses which were named at the conclusion of this paper, besides those assisting me to give it authenticity in the absence of a notary, appeared the citizen Jayme Hartz, of Nacogdoches, in whom I have confidence and with whom I am personally acquainted, and said he acknowledges the present agreement, and has sold really and publicly, in fee and for ever, to the citizen Jonathan C. Peyton, of this vicinity, a grant of the supreme government of the State, dated 11th of March, the year last passed, of eleven leagues of land located on the public domain of this department, which was sold to the citizen Gregorio Basquez, of the municipality of Nacogdoches, by virtue of the twenty-fourth article of the colonization law of the 24th of March, 1825, which, by a public instrument of sale dated 22d September, 1831, and one which is authentic, having seen it myself, he transferred, confirmed, and sold the said grant of eleven leagues of land to your petitioner, by which possession and title he granted him especial power under

date of the same month and year, and in which I have confidence, having seen it also, and which is hereby transferred to the purchaser, and which documents your petitioner will place in his hands, and he hereby concedes to him the said grant of eleven leagues of land upon the same conditions, privileges, and obligations that were imposed upon the said Gregorio Basquez by the governor, for the price and sum of five hundred dollars, which he acknowledges to have received in the current coin to his full satisfaction; upon which he renounces the laws *non numerata pecunia no entrego e prueba,* it being upon the express condition that the purchaser will pay the charges of the surveyor, commissioner, papersealing, recording of title, and claims of the State for the original price of the land conformably to its quantity, and for all other legal charges which may be considered as an augmentation of the said price for which he has sold the said grant; and he declares that this is the just value of the said lands, but if they are worth more or less the excess or surplus he makes a gift or donation to the purchaser pure, more perfect, and irrevocably; and for the sanctity and security of this sale he binds his person and property that he has or may have, and with them submits himself to the jurisdiction and judgment of the tribunal which in this matter ought to adjudicate, and he gives them the same competency for exercising every right and executive obligation as if they were decrees authoritatively passed and properly adjudicated.

" He renounces all the laws which could favor him and prevent his general renunciation. In testimony of which I grant this and name with myself the instrumental witnesses, D'n Amos Gates and Samuel Gates, citizens of this municipality, to which I certify as well as those assisting me.

" HORATIO CHRIESMAN.

" HYMAN HARTZ.

" De Asistencia: OLIVER JONES.

" De Asistencia: FRANCIS ADAMS.

"'TREASURY DEPARTMENT, OFFICE OF COMM'R OF REVENUE.
Sept. 19, 1840.

" Received of H. W. Raglin the sum of twelve hundred dollars in the promissory notes of the government, being the amount of dues upon the within fifty labors of arable land and ten hundred and twenty-five labors of pasture-land granted to Gregorio Basquez, title dated Oct. 7, 1833, as appears from the certificate of John

P. Borden, commissioner of the general land-office, now on file in the office; payment made by the administratrix of J. C. Peyton, att'y.

"$1,200.

"E. L. STICKNEY, *Acting Comm'r of Rev.*

"I, Harrison Owen, county clerk of records in and for the county of Robertson, do certify that a true copy of the within is entered on record in my office at Franklin this third day of April, A.D. 1841.

"HARRISON OWEN, *Co. Rec. R. C.*

"Recorded in book C, pages from 110 to 125. Paid by B. Gillespie, my fees, par funds."

"*Fifth*, Grant or title from Luke Lesassier, alcalde, &c., of eleven leagues of land (including the four in controversy) to Jonathan C. Peyton, attorney of Gregorio Basquez, of date eighteen hundred and thirty-three (1833).

"Third stamp — two reales.

"Legalized for the State of Coahuila and Texas for the years 1828, '29, '30, '31, '32, & '33. Williams.

"In the town of San Felipe de Austin, on the seventh day of October, 1833, I, the citizen Luke Lesassier, constitutional alcalde of this town and its jurisdiction, in the exercise of the authority which has been conferred on me by the supreme government of this State, by decree dated at Leona Vicario, on the 11th March, 1831; and in consideration of the sale executed by the aforesaid supreme government in favor of Gregorio Basquez, a native of the city of Mexico, then residing in the town of Nacogdoches, of eleven leagues of land, as will appear from the superior decree of sale, dated in the aforesaid Leona Vicario on the eleventh day of March, 1831, and presented by his attorney, Jonathan C. Peyton, as will be seen on pages 3 and following of this proceeding; and in attention to the superior order of his excellency the lieutenant-governor, dated on the twenty-ninth day of January of this year, and circulated by the chief of this department on the 19th of last February, repealing the provisional decree of the supreme government of the State in relation to those citizens to whom had been granted land not being permitted to take possession of them until the commissioner-general of the nation shall have made a reservation; and inasmuch as none of those eleven leagues applied for by the interested party are at

any of those points ceded to the federation by the aforesaid order and in view of the approval granted by the empresarios Messrs. Austin and Williams, written upon the first page of this proceeding, as the lands belong to the enterprise of said empresarios — in conformity with the colonization law of the State of 24th March, 1825, and in the name of the State, I confer upon and put the aforesaid attorney of the citizen Gregorio Basquez in real, virtual, personal, and actual possession of eleven leagues of land, the same which he has asked for and that the government has sold to him upon the Brazos River; the situation, lines, limits, and corners of the same are delineated in the notes of survey made by the principal scientific surveyor, Francis W. Johnson, on pages two, and following of this proceeding, with the figure thereof shown in the map hereunto annexed. The aforesaid lands, by said notes of survey, are, in the opinion of the surveyor, to be of the arable class in two leagues, and of the pasture class in nine leagues.

"I, the commissioner and alcalde aforesaid, in the exercise of the authority conferred on me by the law, do declare, in accordance with said classification, he shall satisfy the State in the sum of one thousand two hundred dollars, according to the provision in the twenty-fourth article of the aforesaid colonization law, dated on the 24th March, 1825, and in the terms designated in the twenty-second article of the same law, under the penalties therein established; being notified that within one year he shall construct permanent landmark at each angle of the land; that he shall cultivate the same in conformity with the provisions in the aforesaid law, and scrupulously comply with all ordained in it, and other enactments on the subject.

"Therefore, by virtue of the authority vested in me by the aforesaid decree of the supreme government of the State, and other orders from the same government on the subject, by the law and pursuant instructions which guide me, I issue the present title, and order that an authenticated copy be taken of it, and let it be delivered to the interested party, that he may possess, use, and enjoy the lands which have been sold to him, his children, heirs, and successors, or whoever of him or of them may have cause, interest, or right to represent, for such is the will of the State. Given at the town of San Felipe de Austin, on the day and date above written, which I sign, with assisting witnesses, according to law.

"L. LESASSIER.

"Ass. witness: W. T. LIGHTFOOT.
"Ass. witness: C. C. GIVENS."

II. In admitting as evidence the papers set forth in the fore-going assignment of error, inasmuch as they do not identify and describe any definite parcel of land.

III. In admitting the testimony of Horatio Chriesman to prove by the declarations of Moore, who is now deceased, that the Basquez grant was surveyed by the latter on the reserve line or at any other particular place, such evidence being merely hearsay.

IV. In admitting his testimony, wherein he undertakes to tell what Moore told him about the location of the Austin & Williams reserve line and the Basquez grant, particularly that Moore informed him in 1834 that he had made the survey of the said four-league Basquez grant; that the upper line of said grant began on the east side of the Brazos River, at the point where the upper line of the reserve began; and that the upper line ran north 71 degrees east, with the reserve line, the full distance of the Basquez line; and that the upper line of the Basquez and the upper line of the reserve were the same to the extent of the Basquez line, — because there was no proof that the upper line of Austin & Williams's reserve was ever in fact run, or was ever required by law, order, or decree to be run, and because there is no call in said Basquez's grant for said line; and because said witness did not state that Moore ever pointed out the place on the ground where he had run either the Basquez line or the said reserve line; and because the testimony was hearsay.

V. In admitting in evidence the following documents: —

"THE STATE OF TEXAS,
          " County of Falls:

" To the Honorable the District Court in and for the County of Falls:

"In pursuance of an order made at the last or fall term of said court (A.D. 1869), directing the undersigned surveyors to proceed and run, or make any survey necessary, and show by report to what extent, if any, the land claimed by J. C. Pool, plaintiff, and C. Jones, defendant, conflicts, and also the land claimed by Rhoda B. Huckins et als., plaintiffs, conflict, if any, with the land claimed by and in possession of J. C. Pool, defendant; said land situated in Falls County, on the east margin of the Brazos River.

"In accordance with said order we, the undersigned surveyors, met on the eleventh day of November, A.D. 1869, at what is known as the Falls of the Brazos, on the east margin of said stream, and all the parties having been notified, and being present, either by themselves or attorneys, we ascertained by the calls of the A. De la Serda grant and the field-notes of the José M. Sanches survey, together with a full and complete examination of lines and natural marks, the precise locality of the southern line of the said La Serda grant, it being the northern line of the said Sanches survey, and for a more particular description reference is hereby made to our accompanying plat, which is made a part of this report.

"We then proceeded to ascertain the boundaries of the Gregorio Basquez grant, and finding that the surveyor of Austin & Williams's colony located the same on what is known as Austin & Williams's reserve line; after searching we found marks, corresponding in age and course, in post-oak timber, near the north end of what is known as Hog Island. After tracing said marks about fifteen miles, and finding the line to run N. 71 E., running from the Brazos River, and judging from the age of the marks and course of the line, together with the facts that after it passed the said Basquez N. E. corner it ran across, and without respect to all the known surveys of the section it passed, and there being no corners made on it, we were entirely satisfied that we were on said reserve line.

"We then ran the northern boundary of the Basquez to the east bank of the Brazos River, and found the following results: —

"That all the land claimed by said J. C. Pool is included within the boundaries of the said Basquez and the said Sanches survey, as set forth in our accompanying plat of said survey, this the 16th of November, 1869.

                          "S. W. BINGHAM.
                          R. F. ALEXANDER.
                          W. S. HUNNICUTT.
                          J. H. COLLARD.


"THE STATE OF TEXAS,
        "County of Falls:

"Personally appeared before the undersigned authority Sam. W. Bingham, R. F. Alexander, W. S. Hunnicutt, and J. H. Collard, whose names are signed to the foregoing report, who, after being duly sworn by me, on oath declare that said report is true and correct in the facts therein stated, and the conclusion arrived at

is true and correct, according to their opinion as scientific surveyors.

"To certify which I hereto sign my name and affix my seal of office on this sixteenth day of November, 1869.

"SAMUEL M. DALTON, *D. C. F. C.*"

"*To the Clerk of the United States District Court for the Western District of Texas, at Austin:*

"ANGELINA B. EBERLY *et als.*  ⎞
                   *vs.*                    ⎬
   JAMES MARLIN *et als.*    ⎠

"SIR,— In obedience to the commands of an order of survey issued from under your hand and seal, in your official capacity of the clerk of the District Court of the United States for the Western District of Texas, at Austin, commanding me to survey a certain tract of land containing four leagues, situated in this county, on the eastern margin of the Brazos River, below the Great Falls thereof, and to ascertain the lines thereof, which land is claimed by the plaintiffs to the above-entitled cause, and which order of survey issued in said cause, and which land was titled to one Gregorio Basquez, I proceeded in last summer (the date not now being remembered) to search for said lines, and about one mile and a half below the Great Falls of the Brazos, where on its eastern margin I found a line to start out from the river at a course of N. 68° E., in a weed-prairie, and at 9,170 varas from the river crossed Big Creek, at 20,220 varas from the river corners in prairie, strike prairie at about 12,500 varas. I then ran south 21° E., at right angles with said line at 4,870. I found another old line running S. 60° W. to the river at 17,266 varas, making a difference in the length of the two lines of 2,960 varas.

"I found the league and labor of land surveyed and located in the name of James Marlin to be entirely in conflict with the before-recited survey.

"In testimony whereof, I have hereunto set my hand this the 29th of December, 1857.

"W. S. HUNNICUTT.

"I, W. S. Hunnicutt, a dept. surveyor for Robertson's land-district, do hereby certify that the foregoing is a true and correct statement of facts to the best of my knowledge. Given under my hand and seal this 29th December, A. D. 1857.

"W. S. HUNNICUTT,
"*Dept. Surveyor for Robertson's Land District.*"

To which the defendants objected, on the ground, among other reasons, that they were not parties or privies to said cause.

VI. In refusing to charge the jury that the concession to Sanchez authorized the owner of said concession to appropriate five leagues of the public domain; and, having shown an older survey than the survey by virtue of the concession to Basquez, the said Sanchez title is the superior title for the lands covered by it.

VII. In charging the jury on the question of limitation, and in refusing to charge that, if the jury believed from the testimony that the ancestor of the defendants, Churchill Jones, entered upon that part of the John Marlin league which is in conflict with the Basquez, as claimed by the plaintiffs, at any time before the plaintiffs or their ancestor made an entry on said Basquez, and that said defendants and their ancestor had so remained in said possession of the lands claimed by them for three years or more before the institution of suit, then they should find in favor of the defendants, Watson, Bartlett, and W. H. Jones, on their plea of limitation.

VIII. In refusing to charge the jury that, if they believed from the evidence that at the date of the purchase by Churchill Jones from the heirs of John Marlin in 1853, the said Jones had no notice by the county map, or other records, or otherwise, of any conflict of the John Marlin league with the Basquez grant, they should find for the defendants, Watson and children, Bartlett and wife, and William H. Jones, even if they should find that the location as claimed by the true location of said Basquez grant.

IX. In rendering judgment on the verdict of the jury, because the same is indefinite, uncertain, and does not find the main issue in the case; viz.; how much of the defendants' land, if any, is covered by the plaintiffs' grant.

The charge to the jury complained of in the seventh assignment of error is set forth in the opinion of the court.

*Mr. Levi W. Goodrich* and *Mr. Matthew H. Carpenter* for the plaintiffs in error.

The papers admitted by the court below, if evidence at all, show legal title in Basquez. The right asserted by the plaintiffs is, therefore, cognizable only in a court of equity. The

concession and the final extension of title were to him, and no deed appears from him.  *Hanrick* v. *Barton*, 16 Wall. 166; *Sheirburn* v. *Cordova et al.*, 24 How. 423.

It is certainly the duty of the surveyor to run around the land intended to be embraced in the survey and patent, and see that such objects are designated on it as will clearly point out and identify the boundaries of the tract, and to extend a correct description of these objects, natural or artificial, into the field-notes of the survey, in order that they may be inserted in the patent, so that the owner, as well as other locators, may have the means of knowing precisely what land is granted.   If the lands cannot be identified by the calls in the grant, it is void.  *Chinowith* v. *Haskell's Lessee*, 3 Pet. 92; *Henshaw* v. *Bissell*, 18 Wall. 255; *Deery* v. *Cray*, 10 id. 263; *Boardman* v. *Reed*, 6 Pet. 328; *Guilbean* v. *Mays*, 15 Tex. 414; *Booth* v. *Strippleman*, 26 id. 440; *Stafford* v. *King*, 30 id. 269; *Phillips* v. *Ayres*, 45 id. 605; *Bartlett* v. *Hubert*, 21 id. 20; *Norris* v. *Hunt*, 51 id. 609; *Anderson* v. *Stamps*, 19 id. 460; *Booth* v. *Upsher*, 26 id. 69; *Hubert* v. *Bartlett*, 9 id. 102; *Muller* v. *Landa*, 31 id. 265; *Welder* v. *Carroll*, 29 id. 317; *Williamson* v. *Simpson*, 16 id. 439; *Shipp* v. *Miller*, 2 Wheat. 316; *Johnson* v. *Paunel's Heirs*, id. 206; *Bruckner* v. *Lawrence*, 2 Doug. (Mich.) 19.

The concession authorizing the appropriation of eleven leagues was sufficient authority to the local officer to sever that quantity from the vacant public domain, and put Basquez in possession of the land so appropriated.  When this is done, the floating right, evidenced by the concession, attaches to a certain specified locality, and the title is complete.  *Graham* v. *United States*, 4 Wall. 259; *Hanrick* v. *Barton*, 16 id. 166.

The charge to the jury set forth in the sixth assignment of error should have been granted.  *Hollingsworth* v. *Holshausen*, 17 Tex. 44; *Warren* v. *Sherman*, 54 id. 441; *Landes* v. *Brant*, 10 How. 348; *Miller* v. *Dale*, 92 U. S. 473; *Henshaw* v. *Bissell*, 18 Wall. 255.

The testimony of the witness Chriesman was hearsay, and should not have been admitted.  *Shutle* v. *Thompson*, 15 Wall. 151; *Adams* v. *Swanson*, 116 Mass. 595; *Long* v. *Colton*, id. 414; *Hall* v. *Mayo*, 97 id. 416.

The question as to the competency of hearsay testimony to establish boundaries has often been judicially considered in Texas. Where a corner or marked line has been pointed out to the witness by a deceased person, who is shown to be in a position to have a knowledge of the facts, the parol declaration has been received; and where it appeared that the survey in question was one of a block of surveys, or was surveyed at the same time by the same surveyor, the plat he made, or his field-notes of surrounding or contiguous surveys, have been received to illustrate and identify the lines of the survey in question. The Supreme Court of that State has not in any instance gone beyond the rule as above stated. *George* v. *Thomas*, 16 Tex. 74; *Stroud* v. *Springfield*, 28 id. 649; *Welder* v. *Carroll*, 29 id. 317; *Evans* v. *Hurt*, 34 id. 111; *Smith* v. *Russell*, 37 id. 247; *Hurt* v. *Evans*, 49 id. 311.

The objections to Chriesman's testimony may be summed up as follows: —

Moore, whose declarations were received, was not shown by evidence *aliunde* to be in a position to have a knowledge of the facts to which his declarations relate. No line or corner, visible or imaginary, was pointed out to the witness, and he says that he never saw any. The statement testified to by him is not a declaration, but a narration of the particular facts of a then past occurrence. It does not appear that primary or direct evidence of the location of the lines and corners of the Basquez tract cannot be produced by the plaintiffs. If the evidence tends to prove any fact, it is that an actual survey was made, and not where the lines or corners were placed; and it does not appear therefrom that the land so surveyed by Moore was or is embraced in the title under which the plaintiffs claim. It is attempted by said testimony to repudiate the description in the grant, and to locate the land claimed under the same by adding to, varying, or contradicting the instrument itself. It does not appear that by proper search a tract of land cannot be found corresponding in description with every call in the plaintiff's title.

When there is only a partial conflict or interference of surveys, the statute will not run in favor of an adverse occupant under a junior title, if his possession does not extend to that

.part of the land in dispute which is within the conflict. · Angell, Lim., sect. 402, and numerous authorities in notes; *Trimble* v. *Smith*, 4 Bibb (Ky.), 257; *Fox* v. *Hinton*, id. 559; *White* v. *Burnley*, 20 How. 235; *Hole* v. *Rittenhouse*, 25 Pa. St. 491. The possession which the owner of the junior title has of that part of the land not within the interference, being lawful within itself, is not, by construction, extended also to a presumed unlawful trespass upon that part embraced within the elder title. For this purpose there must be an actual, visible, and exclusive adverse possession of the land in controversy. *Wheeler* v. *Moody*, 9 Tex. 377; *Gillespie* v. *Jones*, 26 id. 346; *Whitehead* v. *Foley*, 28 id. 268. Such possession, if not continuous for the full term limited by the statute, is insufficient, whether it be lost by the voluntary act of the party, or by his forcible ouster, or by a final judgment against him in a suit brought to recover the estate. *Shields* v. *Boone*, 22 Tex. 193.

. *Mr. Samuel R. Fisher* and *Mr. Philip Phillips*, contra.

In *Hanrick* v. *Barton* (16 Wall. 166), relied on by the plaintiffs in error in support of their proposition that Peyton's title was an equitable and not a legal one, there was not, as in this case, a deed from the original grantee.

If, as there held, a power of attorney from La Serda to Roberts authorizing him to sell, and a substitution by Roberts of Williams, and a sale by the latter, passed a legal title, surely a sale from Basquez to Hartz, and from the latter to Peyton, passed a legal title.

But by what law or test is the title of Peyton to be adjudged an equitable one? Equitable and legal titles are founded upon the distinction between equitable and legal estates, and there cannot be an equitable estate or title in one, without a corresponding legal estate or title in another. In other words, there must be a trustee in whom the fee is vested, and a beneficiary or *cestui que trust*.

. In the case at bar, where and in whom is the fee or legal estate? Where and in whom is the equitable estate? And how was the trust created?

The fee and absolute title were vested in Basquez, with the power of disposing of it when the concession was made. All the estate and interest of the government were conveyed.

*Hancock* v. *McKinney*, 7 Tex. 384; *Martin* v. *Parker*, 26 id. 253.

The fee, then, is not in the government nor in him; for if it passed to him, and he, having the power to do so, disposed of it in express terms by his act of sale, it can only be in the vendee. There is no room for a trust. The estate, expressly limited in terms by the act of sale or deed from Basquez, is an estate in fee; for he there declares "that he has sold, really, publicly, and in fee and for ever," &c.

At the time of the acquisition of Peyton's title, as noted by the Supreme Court of Texas in *Martin* v. *Parker* (*supra*), the common-law distinction between legal and equitable titles did not obtain.

The case at bar does not involve the question of remedy. The question is one of estate, and must be determined by the law in force when the title was acquired. *Steinbach* v. *Stewart*, 11 Wall. 576; *Hanrick* v. *Barton, supra; Robinson* v. *Campbell*, 3 Wheat. 212.

The difference between a Mexican concession or grant by sale, and a patent from the United States or a State, as noted in *Hanrick* v. *Barton*, is too obvious for comment.

The grant to Basquez being the primary title, and the extension to the land but the incident, the extension when made related to the grant and vested in Peyton the absolute title in fee, even if it did not, as we contend, pass when the grant was made.

Peyton stands in privity with Basquez, who initiated the proceedings, and though the extension of title is not to be analogized to a patent, still, if necessary, the doctrine of estoppel and relation may be invoked.

If applied for the purpose of justice in the case of a patent, where the fee resides in the government until the patent issues, it certainly should apply to a case where the government parts with all its title when a grant is made. *Barr* v. *Gratz*, 4 Wheat. 213; *Stoddard* v. *Chambers*, 2 How. 284; *Landes* v. *Brant*, 10 id. 348; *Bean* v. *Welsch*, 17 Ala. 770; *Dickerson* v. *Talbot*, 14 B. Mon. (Ky.) 60; *Cavender* v. *Smith*, 5 Iowa, 157; *Irvine* v. *Irvine*, 9 Wall. 617; *Langdeau* v. *Hanes*, 21 id. 521; *McCarthy* v. *Mann*, 19 id. 20.

The genuineness of Peyton's title was admitted; possession had been held under it for nearly twenty years, with payment of taxes. The plaintiff below stood ready to prove, and did prove to the satisfaction of the jury, its actual survey and identity on the ground. The presumption was that the survey had been made, and it was incumbent on the defendants to repel it. *Phillips* v. *Ayers*, 45 Tex. 601; *Jenkins* v. *Chambers*, 9 id. 167; *Booth* v. *Strippleman*, 26 id. 436. The action of the alcalde in extending title on the survey is not to be examined with hypercritical spirit. *Hancock* v. *McKinney,* 7 id. 384; *Hancock* v. *Horton*, 11 id. 220.

There is no patent ambiguity in the grant, but the court erroneously held that an actual survey was necessary to its validity. *Stafford* v. *King*, 30 Tex. 537; *Jones* v. *Burgett*, 46 id. 284; *Newsom* v. *Pryor*, 7 Wheat. 7.

No case in Texas or elsewhere can be produced where a grant of this character, containing a specific description of the granted premises, has been held absolutely void upon an objection *in limini*.

To have so held in this case would have been confiscation under the guise of construction. It is not necessary that the grant itself should contain such a description as will, without the aid of extrinsic testimony, ascertain precisely what is conveyed. If by such testimony it can be located, it should not be held absolutely void for uncertainty. *Blake* v. *Doherty*, 5 Wheat. 359; *Cavazos* v. *Trevino*, 6 Wall. 773; *Ragsdale* v. *Robinson*, 48 Tex. 379; *Williamson* v. *Simpson*, 16 id. 433; *Phillips* v. *Ayers*, 45 id. 601; *Johns* v. *Shutz*, 47 id. 578; *Booth* v. *Strippleman*, 26 id. 436; *Kingston* v. *Pickens*, 46 id. 99; *Jones* v. *Burgett*, id. 284; *Lohff* v. *Germer*, 37 id. 578; *Browning* v. *Atkinson*, id. 633; *Stafford* v. *King*, 30 id. 257; *Bass* v. *Mitchell*, 22 id. 285; *Mitchell* v. *Burdett*, id. 633; *Bolton* v. *Lann*, 16 id. 96; *Urquhart* v. *Burleson*, 6 id. 502.

The testimony of the witness Chriesman was clearly admissible. The Supreme Court of Texas has in a current of decisions commencing in 1856, and continuing down to the present day, held that reputation is admissible as evidence in questions of private boundary; and has given to the unsupported declarations of a deceased person, as to where a line or

corner is, the weight of common reputation, and permitted such declarations to be proved under the rule that in questions of boundary hearsay is evidence. *George* v. *Thomas*, 16 Tex. 74; *Stroud* v. *Springfield*, 28 id. 649; *Welder* v. *Carroll*, 29 id. 318; *Wheeler* v. *Hunt*, 34 id. 47; *Smith* v. *Russell*, 37 id. 247; *Evans* v. *Hurt*, id. 111; *Hurt* v. *Evans*, 49 id. 311.

In *Stroud* v. *Springfield* the following cases are cited and approved: *Speer* v. *Coate*, 3 McCord (S. C.), 227; *Blythe* v. *Sutherland*, id. 258; *Boardman* v. *Reed*, 6 Pet. 328; *Shutte* v. *Thompson*, 15 Wall. 151.

The rule established by these decisions has become so firmly engrafted upon the laws of Texas as to become a rule of property.

It has also been adopted by many other States. *Tate* v. *Southered*, 1 Hawks (N. C.), 45; *Shepherd* v. *Thompson*, 4 N. H. 213; 49 id. 230; *Powers* v. *Selsby*, 41 Vt. 289; *Higby* v. *Bidwell*, 9 Conn. 447.

Where the rules of evidence established by statute or by the decisions of the highest tribunal of a State become a rule of property, more especially in matters of real estate, they will be followed by the courts of the United States. *Waring* v. *Jackson*, 1 Pet. 570; *Hinde* v. *Vattier*, 5 id. 398; *Henderson* v. *Griffin*, id. 151; *Polk's Lessee* v. *Wendell*, 5 Wheat. 293; *Jackson* v. *Chew*, 12 id. 153; *Olcott* v. *Bynum*, 17 Wall. 44; *Lloyd* v. *Fulton*, 91 U. S. 479; *Lamborn* v. *County Commissioners*, 97 id. 181; *Orvis* v. *Powell*, 98 id. 176.

MR. JUSTICE STRONG delivered the opinion of the court.

This is an action of ejectment brought to recover the possession of four leagues of land on the east bank of the Brazos River, known as the Gregorio Basquez survey of four leagues. The defence set up against the claim of the plaintiffs was the general issue by which the title of the plaintiffs was denied, as also the wrongful entry of the defendants. The Statutes of Limitation were also pleaded.

At the trial in the Circuit Court a verdict was obtained by the plaintiffs, upon which a judgment was entered, and the defendants have brought the case here, assigning several errors to the rulings in the lower court.

Before proceeding to examine them, it is necessary to notice an objection interposed by the plaintiffs against their being considered at all.

The verdict was rendered on the 17th of February, 1877, and judgment thereon was entered on the same day. On the 19th of the same month the defendants moved for a new trial. This motion was overruled on the 20th. Two days afterwards (on the 24th) the writ of error was sued out, tested on that day. It does not appear when the writ was filed or served. A citation was also issued on the 24th of February and returned by the marshal, received in his office September 3, and served the same day.

The defendants' bills of exception upon which their assignments of error are founded were signed by the judge on the 28th of February, and filed in the cause on the 1st of March next following. This was during the term at which the cause was tried, but eleven days after the verdict was rendered. The plaintiffs' counsel was present when the bills were signed, and objected on the ground that they were not presented for signature within the time limited by the rule of the court. That rule was as follows: " No bill of exceptions will be signed unless presented to the judge within five days after the close of the trial, unless further time be allowed by the court." No objection was made to the correctness of the bills or to their signature because a writ of error had been sued out.

On the 1st of March an order was made by the court extending the time for presenting and filing the bills until that day (the plaintiffs objecting to the order), and accordingly the bills were then filed.

It is now insisted that the bills of exceptions cannot be considered a part of the record, and that they are not properly here for review. For this several reasons are advanced, the first of which is that the presentation to the judge was not in the time prescribed by the rule of the court. But the rule requiring the presentation of bills for the signature of the judge within five days is not a rule which controls his action. He may depart from it in order to effectuate justice. *Stanton* v. *Embrey*, 93 U. S. 548. It is a direction to the parties, and it expressly reserves the power to enlarge the time. It is no

doubt necessary that exceptions should be taken and, at least, noted before the rendition of the verdict; but the reduction of the bills to form, and the signature of the judge to the bills, required for their attestation, or, as said in the Statute of West-minster, "*for a testimony*," may be afterwards, during the term. In practice it is not usual to reduce bills of exception to form and to obtain the signature of the judge during the prog-ress of the trial. Nor is it necessary. The Statute of West-minster did not require it. It would greatly and uselessly retard the business of courts were it required that every time an exception is taken the progress of the trial should be stayed until the bill could be reduced to form and signed by the judge. For this reason it has always been held that the exception need only be noted at the time it is made, and may be reduced to form within a reasonable time after the trial is over. *United States* v. *Breitling*, 20 How. 252 ; *Stanton* v. *Embrey*, *supra* ; *Dredge* v. *Forsyth*, 2 Black, 564. The time within which the signature of the judge must be applied for, if within the term, is left to the discretion of the judge who noted the exception when it was made. It may depend much upon the nature of the bills. Some require much more time for preparation than others. It is true a judge cannot be per-mitted to make up a statement of facts, after the writ of error is issued, upon which the case shall be heard. *Generes* v. *Bon-nemer*, 7 Wall. 564. That is quite a different matter. But when an exception has been taken at the trial and noted, re-ducing the exception to form afterwards and attesting it is not making a new case : it is merely verifying the case as it ap-peared on the trial.

It is further urged by the plaintiffs that the defendants waived their exceptions by suing out the writ of error before the signature of the judge was obtained. In support of this objection we are referred to Tidd's Practice, 863, where it is said, " If a party who at the trial of a cause has tendered a bill of exceptions, bring a writ of error before he has procured the judge's signature to such bill, he thereby waives the bill of exceptions, and will not be permitted by the court of error afterwards to tack or append the bill of exceptions to the writ of error." 4th Am. ed., from the 9th London. For this the

author relies on *Dillon* v. *Doe dem. Parker*, 1 Bing. 17; s. c.
11 Price, 100. In that case a year had elapsed after the writ
of error had issued. The transcript of the record had gone
into the Court of Errors. The common assignments of error
had been made and issue had been joined before the plaintiff
in error moved the court in error to compel a settlement of the
bill in the lower court, and asked that it might be appended to
the writ. In response to this motion, it was observed by two
of the justices that the proper course would be to apply to the
inferior court (the Court of King's Bench), which might, per-
haps, make such an order, and then the bill of exceptions might
be brought up by an allegation of diminution. The case cited
hardly sustains the text. Only one of the judges expressed
the opinion that the writ of error and the return of the record
were a waiver of the bill of exceptions. But if that is the rule
in the English courts, it is not imperative even there. Where
the presentation to the judge has been delayed from the de-
fault of the defendant in error, or for other sufficient reasons,
the Court of Errors will allow the bill of exceptions, when
signed, to be tacked to the record as of the time when the
record was removed. *Taylor* v. *Willans*, 2 Barn. & Adol. 845;
s. c. 6 Bing. 512. The case is also reported in 4 Moo. & P.
257, where the facts are fully stated. On the trial before
Chief Justice Tindal, on the 23d of December, a bill of excep-
tions was tendered, the substance of which was reduced to
writing and given to the officer of the court before the ter-
mination of the cause, but it was not then signed and sealed.
There was a verdict for the plaintiff. The defendant sued out
a writ of error in the King's Bench. Subsequently, on the
11th of February following, the bill of exceptions in an amended
form was settled by the counsel for the parties, and a copy was
sent to the plaintiff's attorney that he might accede to its terms,
or suggest alterations before it was sealed by the Chief Justice.
At the same time, the defendant served a rule to transcribe the
record for return with the writ of error. The bill not having
been returned, the court granted an order for its return. It
was argued against the rule (and *Dillon* v. *Parker* was cited in
support of the argument) that the bill was waived, and that, by
the writ of error and the rule to transcribe, the record had been

removed into the King's Bench.   But the court, all the judges concurring, retained the order upon the attorney, holding that the Chief Justice might seal the bill.  'It is not, therefore, by any means settled, even in England, that suing out a writ of error is a waiver of unsigned bills of exceptions.

We know of no decision in this country that asserts or gives any countenance to such a rule, or any reason that justifies it, unless it be one in New York, to which we shall refer.   True, a writ of error here, as in England, is supposed to remove the record of the court to which it is directed into the superior tribunal.   But this is a mere fiction.   In neither country is the record itself actually sent up.   A transcript only is sent. In England, at common law, a writ of error operated as a *super-sedeas* and stayed all action of the inferior court, and thence it was regarded as removing the record and ousting the jurisdiction of that court.   The law there has been changed.   And here, the writ is of itself no *supersedeas*.   If there be no bail for a *supersedeas*, a writ does not stay the action of the trial court.   An execution may be issued and executed though a writ of error is pending.   Much more, it would seem, must the court to which the writ is sent have power, during the term in which the case is tried, to put its records and proceedings in form to return them in obedience to the writ.   If that cannot be done, great hardship and injustice would in many cases be the result.   As we have said, bills of exceptions cannot always be formally prepared until a considerable time after verdict and judgment.   They may require, in some cases, a full statement of almost all that occurred at the trial.   Papers necessary to be incorporated may be mislaid or withheld by the opposite party; the charge of the judge, to which exception has been taken, may not have been filed, or sickness may have interfered. Meanwhile, judgment on the verdict may have been entered, and unless the party can protect himself by a writ of error, an execution may follow.   For these reasons, the universal practice is to give reasonable time to make up the bills of exceptions and obtain the signature.   This is not altering the record, it is completing it.   It is not exercising jurisdiction over the case. It is merely putting into form the record statement of what was done before the writ of error was sent down.   In *Brown* v.

*Bissell* (1 Dougl. (Mich.) 273), where a bill of exceptions returned with a writ of error appeared to have been signed after the writ was sued out, it was held to be, at most, whether at common law or under the statute, a mere irregularity, which was waived by a joinder in error. *Witbeck* v. *Waine*, 8 How. (N. Y.) Pr. 433.

The remaining objection to the bills of exceptions is that they were not signed nor filed *nunc pro tunc*, but that they appear on their face to have been signed and filed ten days after the trial. We think, however, the absence of any order that the bills should have the same effect as if they had been signed and filed during the trial is not a fatal objection. The order of March 1, extending the time for signing and filing, is equivalent to such an order. And the fact that the date of the signature was the 28th of February is of no practical importance. At most it is only an irregularity. It is not a void act. Perhaps the bills would appear more regular had they been dated February 17, but they are recitals of what occurred at the trial, and they show that the exceptions were then taken — taken in time. If it be kept in mind that the judge's signature is required only for "testimony" that the exception was taken at the trial, and before verdict, it cannot be material that the testimony was given after the close of the trial, if given during the term. We do not overlook what was said in *Walton* v. *United States*, 9 Wheat. 651. We gather the facts of that case only from the opinion of the court, delivered by Mr. Justice Duvall, by which it appears that the bill of exceptions did not show that any exception was taken at the trial. That, of course, was a fatal defect. But, after having noticed that fact, he made some general observations. After stating that it will be sufficient if the exception be taken at the trial, and noted by the court with the requisite certainty, and that it may afterwards, during the term, according to the rules of court, be reduced to form and signed by the judge, he added, "But in all those cases the bill of exceptions is signed *nunc pro tunc*, and it purports on its face to be the same as if actually reduced to form and signed pending the trial. And," he said, "it would be a fatal defect if it were to appear otherwise; for the original authority under which bills of exceptions are

allowed, has always been considered to be restricted to matters of exception taken pending the trial and ascertained before the verdict."

These remarks were not necessary to the decision of the case, and they are unsustained by any authority, so far as we know, that existed when they were made. In *Ex parte Bradstreet* (4 Pet. 102), Mr. Chief Justice Marshall said, a practice to sign a bill of exceptions after the term must be understood to be a matter of consent between the parties, unless the judge has made an express order in the term allowing such a period to prepare it. No intimation was given that the signature must be *nunc pro tunc.*

*Walton* v. *United States* was referred to in *Law* v. *Merrills* (6 Wend. (N. Y.) 268), by one of the judges, and the language of Mr. Justice Duvall quoted, but it was unnecessary to a decision of that case. The bill there had been signed a year after the trial, by a judge who had not tried the cause. We find no case which can be regarded as an authoritative decision that a bill of exceptions, signed during the term at which the trial took place, though after the close of the trial, must be antedated to make it effective, or ordered to be filed *nunc pro tunc,* as of a time during the trial. Nor can we discover any reason for such a requirement. During the term the records of the term are before the court for amendment in matters of form, and whether a bill was signed as of a date after judgment if during the term, or antedated to a time during the trial, is a question of form only, if it appears that the exceptions were in fact taken before verdict and during the progress of the trial. Confessedly it may be signed after judgment, as of a date before, and be effective, though the date of the signature in such a case is false. Why should giving to the signature its true date destroy it? The reason why it is required that a bill shall be presented for signature during the term (except in extraordinary cases, when delay is allowed by the judge), is that the facts appearing and rulings made at the trial may be fresh in his memory. Are they any more fresh in his memory when he antedates the bill, or orders it to be filed as of the date of the trial, than when he gives to the signature and filing their true date? We cannot doubt that in a multitude of cases

bills of exceptions have been signed after judgment, and filed
without any order that the signature and filing be entered *nunc
pro tunc*, but, when the true time of the signature appeared,
have been treated as sufficient, whenever they have shown that
the exceptions were taken during the trial. And, we think,
it would be a surprise to the profession, and work great wrong
to suitors, were we to hold such bills invalid.

In *Neece* v. *Haley* (23 Ill. 416), exceptions were duly taken
at the trial. The record showed that the bill of exceptions
was signed three days afterwards, but during the term. It
was held that the bill was good, and that the record need not
explain the delay.

So it was ruled in *Illinois Railroad Co.* v. *Palmer* (24 id. 43),
that, if the bill of exceptions clearly shows that exceptions were
taken at the proper time, it is immaterial that it was not signed
till some days after the trial, and that it spoke in the present
tense.

In *Dean* v. *Gridley* (10 Wend. (N. Y.) 254), Savage, C. J.,
declared that it was not required the bill should be so drawn
as to appear to have been signed upon the trial, whether it was
so or not. He was speaking of the Supreme Court of Errors.
See *Hallowell* v. *Hallowell*, 1 Mon. (Ky.) 130 ; *Hughes* v. *Robertson*, id. 215.

We pass, then, to a consideration of the assignments of error.
The first raises the question whether the title which was set up
in Jonathan Peyton was a legal one or merely an equity. As
set out in the several bills of exceptions, it appears to have been
as follows: On the 28th of September, 1830, Gregorio Basquez
applied to the proper authorities of the Mexican government
for a grant in sale of eleven leagues of vacant land in the
department wherein Nacogdoches was situated, with the privilege of selecting them together, or separate, or in distinct
places.

On the 11th of March next following, a concession was made
in accordance with the prayer of the petition, and an order
given to the commissioner for the partition of land, or to the
alcalde of the jurisdiction, to put the petitioner into possession
of the subject of the grant.

On the 20th of September, 1831, Basquez gave a power of

attorney to Don Jayme Hartz, empowering him to solicit the possession and titles to the said eleven leagues, in the place or places which best suited him (Hartz), together or separate, and empowering him also to appoint substitutes.

Two days afterwards Basquez sold and conveyed the grant for the sum of $150 to Don Jayme Hartz in fee.

On the 2d of March, 1832, Hartz, in consideration of $500 to him paid, sold the concession or grant to Jonathan Peyton, the ancestor of the plaintiffs, in fee, and substituted him as attorney. The act of sale recited the conveyance of Basquez to the vendor.

On the 7th of October, 1833, the constitutional alcalde, by a legalized act, conferred upon and put Peyton, the aforesaid attorney of Basquez, " in real, virtual, personal, and actual possession of the eleven leagues," the same which had been granted to Basquez, describing them by the situation, lines, limits, and corners as delineated in the notes of survey made by Francis W. Johnson, the principal surveyor, on pages two and following of the proceeding, with the figure thereof shown in the map thereunto annexed. The act of the alcalde also ordered that an authenticated copy of it should be delivered to the interested party that he might possess, use, and enjoy the lands sold to him, his children, heirs, and successors, or whoever of him or them might have cause, interest, or right to represent.

We are unable to see why these proceedings did not vest the legal title to the lands granted in Peyton. The possession was delivered to him, and he was instituted therein. The interest of Basquez, whatever it was, both legal and equitable, had been sold by him to Hartz, and Hartz had sold it to Peyton. The institution into possession must, therefore, have inured to the benefit of Peyton. It is a mistake to allege, as the defendants now do, that the final extension of title was to Basquez. It may be that Peyton would have held the land for the use of Basquez, had he been only the attorney of Basquez. But he was more. He was a grantee of all the Basquez right. In this particular the case is unlike *Hanrick* v. *Barton*, 16 Wall. 166. In that case, as here, there had been an extension of the possession to the attorney in fact of the original grantee of

the government, and it was held that the extension inured to his benefit, and that its legal effect was to perfect title in him. But there had been no grant of the original title to the attorney. An assertion of title in him was, therefore, a fraud upon his principal. But this court said: " We do not mean to say that the original grantee, if not prohibited by law, might not have assigned his inchoate title to a third person, nor that the title might not, by a grant in proper form, have been perfected in such assignee."

It has repeatedly been decided in Texas that purchasers under the twenty-fourth article of Mexican laws of 1825 can alienate their grants as soon as the concession has been made to them, before the land was selected, or the title of possession was issued. *Ryan* v. *Jackson.* 11 Tex. 391; *Clay* v. *Holbert*, 14 id. 189. In *Martin* v. *Parker* (26 id. 254), it was held that a formal act of sale by the original grantee, with a power to the purchaser to obtain the title of possession, must be held to constitute the purchaser the absolute owner of the property when he is put into possession of the land, and the evidence of title by the proper officer of the government. Such is this case. The first assignment of error, therefore, cannot be sustained.

Nor can the second. The original grant, it is true, did not locate the subject of the grant. It contemplated a selection and location thereafter, and, when these were made, as the jury found, and the title of extension was given, the title was complete. There was enough in the extension, coupled with the notes of the surveyor (made a part of it), to enable the location to be identified  A more important question is raised by the third and fourth assignments.

It was a very material inquiry at the trial, where the Basquez four leagues had been located. The title-papers described the location as beginning at a stake marked P., upon the left margin of the river Brazos, running thence north 71 degrees east, to a corner; thence by other courses back to the river, and thence up the river to the place of beginning. Such was the report of the survey. The starting-point was a stake, perishable, of course, which, as might have been expected, would not be found after a lapse of forty years. But the survey was

not a mere chamber one. There was evidence that it had actually been made upon the ground, and the court submitted to the jury to find whether it had or not. No exception was taken to this submission, and the jury found that an actual survey had been thus made. Its location was the matter chiefly in controversy. The claim of the plaintiffs was that its upper or north line, described as beginning at a stake marked P on the left bank of the Brazos River, running thence by a course north 71 degrees east, was the upper line of the Austin & Williams reserve, and identical with it to the extent of the Basquez survey. To prove this they introduced the testimony of Horatio Chriesman, against the objection of the defendants. Chriesman had been a surveyor under F. W. Johnson, principal surveyor of the Austin & Williams lands in the reserve, and William Moore, deceased, had been another deputy. The two deputies, in 1833 and 1834, had been engaged in surveying in the reserve other lots on the left side of the Brazos River. Neither of them was on the Basquez tract, or on any line of it. Chriesman was laying out tracts fronting one thousand varas on the river. By direction of Johnson, these surveys were to include all the river-front between the upper line of the Ruiz (a grant located on the lower line of the reserve) and the lower line of the Basquez four-league grant. Moore was surveying in the rear. During the time that Moore and the witness were thus engaged surveying in the reserve, and perhaps before that time, as he testified, he was allowed to state that Moore informed him that he had made the survey of the Basquez four-league tract; that the upper line of said grant began on the east bank of the Brazos River, at the point where the upper line of the reserve began; and that the upper line of the Basquez ran north 71 degrees east with the reserve line the full distance of the Basquez line, and that the upper line of the Basquez and the upper line of the reserve were the same to the extent of the Basquez line. It was this testimony, and other of a similar nature, to which the defendants objected, and to the admission of which they excepted.

It is to be noticed that the witness himself, as he expressly stated, had no knowledge of the location or lines of the Basquez survey, except what Moore had told him. The declarations of

Moore were made, not when he was pointing out the bounda-
ries of the Basquez survey, but when he was at a distance from
the place of beginning of that survey and from its upper line.
That Moore had made the survey, or ever been upon its upper
line, or on the upper line of the reserve, is proved only by his
assertion, which the court allowed to be given in evidence.
There was no such proof *aliunde*. Whether he had any knowl-
edge of the facts whereof he spoke to Chriesman, is known
only from his own statement.

Again, Moore's declarations had no reference to reputation
in the neighborhood. They are not to be confounded with
proof of reputation, — proof of what the community thought,
believed, or said. As repeated by the witness, they were
mere hearsay, the unsworn declarations of a deceased person
respecting a particular fact not of a public nature. We do
not question that such declarations of reputation respecting
ancient public boundaries are admissible, and they have some-
times been admitted in controversies respecting private boun-
daries. But they are admissible in only a limited class of
cases, — a class much more limited than that in which such
evidence is offered to prove reputation of public boundaries.
Proof of reputation is open to rebuttal by witnesses. Not so
with declarations of a particular fact respecting a private boun-
dary. They are, therefore, receivable only when made coinci
dently with pointing out the boundaries and generally as part
of the *res gestæ*.

In *Ellicott et al.* v. *Pearl* (10 Pet. 412), we find a case which
bears strongly on the present. In that case, which was a writ
of right for a tract of land, in which the location of a survey
was a matter in controversy, a witness was offered to prove
that one Moore, who was dead, but whose name was put down
as one of the chain-carriers in making the original survey, and
who was subsequently present when lines were run on the same
land, had declared that a certain corner was the corner made
by the surveyor when the original survey was made and the
line was run for that survey. The evidence was rejected, and,
this court ruled, correctly rejected, though the declarations
offered were made by one who was proved by other evidence
to have assisted in running the line. This case is instructive,

and we believe it is in harmony with the rule generally enforced in this country. It certainly is in accord with the ruling of the English courts.

It is true that in several States of the Union decisions have been made recognizing the admissibility of declarations of deceased persons, even though they were statements of particular facts and in regard to mere private boundaries; but many of them, perhaps most of them, were admissible on other grounds, either as parts of the *res gestœ* or declarations of parties in possession. We think such is not the preponderant weight of decision. In Massachusetts, where the subject has been much discussed, it is held that, to be admissible, such declarations must have been made by persons in possession of land and in the act of pointing out their boundaries. *Bartlett* v. *Emerson,* 7 Gray (Mass.), 174; *Daggett* v. *Shaw,* 5 Metc. (Mass.) 223. And again, in *Long* v. *Colton* (116 Mass. 414), when it was said that it is an element not to be disregarded, especially where the question is one of private boundaries, that the declaration was made while in the act of pointing out the boundaries, on the declarant's land. The declaration derives its force from the fact that it accompanies and qualifies an act, and is thus a part of the act. A similar ruling was made in *Bender* v. *Pitzer,* 27 Pa. St. 333.

We will not undertake to review the vast number of decisions of State courts upon this subject. It would greatly protract this opinion. Some things may be deduced from them, which, though not universally recognized, are the conclusions to which, we think, a great majority of them lead. In questions of private boundary, declarations of particular facts, as distinguished from reputation, made by deceased persons, are not admissible unless they were made by persons who, it is shown, had knowledge of that whereof they spoke, and who were on the land, or in possession of it when the declarations were made.

To be evidence, they must have been made when the declarant was pointing out or marking the boundaries or discharging some duties relating thereto. A declaration which is a mere recital of something past is not an exception to the rule that excludes hearsay evidence. Still, if a different ruling has been

made in the State of Texas, and has become a rule of property there, applicable to the determination of controversies respecting disputed boundaries, we should feel constrained to apply the Texas rule to this case. We have, therefore, carefully examined all the decisions of the Supreme Court of that State which relate to the subject. The result has been to convince us that there is no essential difference between the rule as there held and the general rules held by the American courts. Hearsay evidence is admitted in questions of boundary to establish old boundary lines, even when private; but it is under restrictions, and the restrictions appear to be the same as those which are recognized elsewhere.

The first case is *George* v. *Thomas*, 16 Tex. 74. What was there ruled was that the declarations of a public surveyor, made while he was making the survey to establish the dividing line, were admissible. They were a part of the *res gestæ.* This is the leading case to which the later cases refer, and upon which they are generally rested. The opinion cites *Blythe* v. *Sutherland*, 3 McCord (S. C.), 258. In that case the declarations of a deceased surveyor, who was proved by a witness to have run the line originally, were admitted in evidence. But they were declarations made while the surveyor was pointing out the line and showing the monuments. *Stroud* v. *Springfield* (28 Tex. 649) goes no farther. The evidence offered in that case was rejected. The court, however, referred to *Speer* v. *Coate* (3 McCord (S. C.), 227), where the court had said in reference to the declarations of a deceased chain-carrier *who had pointed out to the witness a corner tree of the survey,* "it cannot be doubted at this day that the declarations of deceased persons *who shall appear to have been in a situation to possess the information,* and are not interested, shall, on a question of boundary, be received in evidence." Even this was not declared to be an accepted rule in Texas, though the chain-carrier who aided in the survey had actually pointed out a corner.

The next case is *Welder* v. *Carroll*, 29 Tex. 317. It decided nothing more than was ruled in the former cases. Indeed, while the court said, " If the locality of a boundary line can be proved by witnesses, who can, from their personal knowledge, or on information derived from general reputation, or from its

having been pointed out to them by the surveyor by whom it
was run, or others who were present at the time, or cognizant
of the fact, it will fix and mark its position." But at the same
time the court rejected the deposition of a witness tending to
prove the locality of the line from information given him by a
surveyor, remarking that "while, as heretofore held by this
court, hearsay evidence to establish ancient boundaries is,
under proper circumstances, admissible, it should be closely
scrutinized and received with proper caution." And it was
held that the evidence was much too vague and uncertain in
respect to the locality of the line of which the witness spoke,
as well as in respect to the source of his information, and the
time and circumstances under which he acquired it.

The next case is *Evans* v. *Hurt and Others*, 34 id. 111. It
decides that declarations of a former owner, since deceased,
who, while in possession of and claiming the land, pointed out
his corner and line to the deposing witness, are evidence of the
boundary in behalf of the parties claiming under him. This
is the rule as held in other States. The court also decided that
the declarations of a son of a former owner who pointed out
the disputed line to the witness were inadmissible; but the case
does not show what they were, nor under what circumstances
they were made. This case came again before the court, and
it is reported in 49 id. 311. The report, however, contains
nothing more definite than what appears in 34 Texas.

The only other case which we have found or to which we
have been referred is *Smith* v. *Russell*, 37 id. 247. In that
case it appeared that the lower court had permitted the defend-
ants to prove that one of the original chain-carriers, who was
dead at the time of the trial, had pointed out to the witness
the place of the corner. The Supreme Court held that the
evidence was properly admitted, with the general remark that
"the declarations of deceased witnesses may be proved to fix
the location of corners and lines," citing *Stroud* v. *Springfield*
and *Welder* v. *Carroll*. From a review of all these cases it is
quite obvious that the rule in Texas is not different from that
which we have endeavored to show is the general American
rule, the guarded rule we have heretofore stated.

Our conclusion, therefore, is that the fourth and fifth assign-

ments of error must be sustained, and that the answer of Chriesman to the fourth, ninth, and nineteenth interrogatories, as well as all the declarations of Moore, were erroneously received.

We discover no error in the admission of the evidence set out in the fourth bill of exceptions. The documents were certainly evidence against one of the defendants.

Nor can the sixth assignment of error be sustained. The survey made under the Sanchez concession was not the completion of his title. It did not identify the subject of the concession until it was accepted by the government, and until the title of possession was given. That was issued Oct. 19, 1833, after the Basquez concession had been consummated.

The seventh assignment relates to the charge given to the jury respecting the Statute of Limitations. To understand this it is necessary to refer to some of the facts that appeared in evidence. It appeared that in 1835 John Marlin, as a colonist, obtained a complete grant from the Mexican government of one league, part of which interfered with the Basquez four-leagues tract. It appeared also that the defendants, Watson and his children, Bartlett and his wife, and W. H. Jones, having shown title in themselves to the several tracts they claimed, by regular transfer from the sovereignty of the soil, gave evidence tending to show that their ancestor, Churchill Jones, in 1855 or 1856, took actual possession of that part of the Marlin league which interfered with the Basquez grant, built a mill and other improvements thereon, and that the possession had been kept up exclusively by said defendants and those under whom they hold, down to the trial. This possession they claimed to be a defence. It appeared, however, that in 1858 the plaintiffs' ancestor entered on the Basquez grant, but not on the interference, and made a lease to James Marlin, permitting him to occupy three hundred and twenty acres. Marlin has ever since resided there, holding as tenant under the plaintiffs or their ancestor.

The charge of the court was as follows: —

" The facts, as I understand the defendants to claim them, are that in 1855, under the Marlin title, and in 1856 or 1857, under the Sanchez title, they took actual possession of their lands lying within the conflict.

" From that date the Statute of Limitations began to run in their favor for the lands embraced within their title as against the Basquez title. If three years elapsed before they were ousted by a superior possession, then their occupancy for three years makes a complete bar to any recovery by the plaintiffs.

" But the plaintiffs claim that in May, 1857, before the defendants had been in possession for the period of three years of any of the lands within the conflict, their possession was interrupted by the entry upon the Basquez grant of James Marlin as the agent for Mrs. Eberly.

" If you find this fact to be as the plaintiffs claim, that James Marlin entered upon the Basquez grant in 1857 as the agent for Mrs. Eberly, claiming title to the whole in her name, we instruct you that for that time the possession of the defendants — they holding under a junior title — was restricted to the lands actually occupied by them, and could not be extended by construction to the bounds called for by their paper title.

" From Jan. 28, 1861, to the 30th of March, 1870, the Statute of Limitations in this State was suspended. No extension, therefore, of the actual possession of defendants between these dates would avail them unless held for three years after the statute had again commenced running, and before the commencement of this suit."

It is this instruction of which the defendants complain. But we think it was correct. It was in accordance with the doctrine asserted in *Clarke's Lessee* v. *Courtney* (5 Pet. 319), and generally recognized. It is true that when a person enters upon unoccupied land, under a deed or title, and holds adversely, his possession is construed to be coextensive with his deed or title, and the true owner will be deemed to be disseised to the extent of the boundaries described in that title. Still, his possession beyond the limits of his actual occupancy is only constructive. If the true owner be at the same time in actual possession of part of the land, claiming title to the whole, he has the constructive possession of all the land not in the actual possession of the intruder, and this, though the owner's actual possession is not within the limits of the defective title. "The reason is plain. Both parties cannot be seised at the same time of the same land under different titles.

The law, therefore, adjudges the seisin of all that is not in the actual occupancy of the adverse party to him who has the better title." These distinctions are clearly shown in the cases. One who enters upon the land of another, though under color of title, gives no notice to that other of any claim, except to the extent of his actual occupancy. The true owner may not know the extent of the defective title asserted against him, and if while he is in actual possession of part of the land, claiming title to the whole, mere constructive possession of another, of which he has no notice, can oust him from that part of which he is not in actual possession, a good title is no better than one which is a mere pretence. Such, we think, is not the law. When the owner of the Basquez title entered upon the tract, took actual possession of a part by his tenant, and retained it, claiming the whole, the law gave to that owner the constructive possession of all that was not in the actual adverse possession or occupancy of another.

In *Altemus* v. *Long* (4 Pa. St. 254), it was ruled that though actual possession under a junior title of part of a tract of land, which interfered with an older grant, gave possession of the whole to the holder of the junior title, yet a subsequent entry of the true owner upon any part of his land was an ouster of the intruder from what he had in constructive possession merely. We know of no authoritative decision that is in conflict with this.

It is sufficient to say of the eighth assignment of error that it is not sustainable. The answer to the defendants' point was clearly correct.

The remaining exception is to the sufficiency of the verdict.

It is said it was "indefinite, uncertain, and did not find the main issue; viz., how much of the defendants' land, if any, is covered by the Basquez grant"? This is not necessary for us now to discuss. It may be the verdict was not sufficiently certain, but as the case goes back for another trial, the matter is of no importance now.

*Judgment reversed and cause remitted for a new trial.*

MR. JUSTICE FIELD and MR. JUSTICE BRADLEY dissented.