SURGHENOR et al. v. RANGER et al.

RANGER et al. v. SURGHENOR et al.

(Circuit Court of Appeals, Fifth Circuit. November 7, 1904.)

Nos. 1,297, 1,279.

1. MEXICAN LAND GRANT—TRANSFER OF TITLE BY GRANTEE—CONSTRUCTION OF INSTRUMENT.

A purchaser of a concession of land from the state of Coahuila and Texas under article 24 of the Mexican colonization law of 1825, before the land had been selected, executed a writing by which, in consideration of a sum of money, the receipt of which was acknowledged, he covenanted to sell the land to two other persons, who agreed to perform in his stead all the conditions of the grant. The purchasers, by a similar instrument, again transferred their right to a third person, upon whose application the grant was surveyed, and title of possession issued to him by the commissioner, reciting that the application was presented by him as attorney in fact for the original purchaser. *Held,* that since, under the settled law, the original purchaser had the power to alienate his concession at once, before the lands were selected, the instrument executed by him constituted an act of sale, and not merely an executory agreement to sell, and that under it the final purchaser, when instituted in possession, took full title, legal as well as equitable; there being, under the Spanish law then in force, no distinction between legal and equitable titles as at common law.

2. SAME—CONVEYANCE EXECUTED BY ONE PARTNER—VALIDITY.

An instrument of sale of a Mexican concession of land in Texas, executed in 1832, by one of two persons who were named as grantees in a

prior conveyance to them, and signed by him "for himself and his partner," under which the commissioner duly authorized thereto by law issued to the grantee title of possession to the lands selected by him under the grant, and under which he was instituted and remained in possession, will be held to have been executed with the consent of the owner who did not sign, and to have passed the title and interest of both; there being evidence that they were partners in a mercantile business, which at that time in Texas consisted in dealing in lands to a greater or less extent, and a verbal sale of land being valid under the Spanish law then in force.

In Error to the Circuit Court of the United States for the Southern District of Texas.

Jas. E. Ferguson and Frank Andrews, for John W. Surghenor and others.

H. Masterson and F. G. Morris, for Solomon Ranger and others.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

McCORMICK, Circuit Judge. This was the Texas action of trespass to try title. It involved the title to the league of land described in the pleadings. It was brought by John W. Surghenor et al., plaintiffs in error, versus Solomon Ranger et al., defendants in error. The parties, by stipulation, agreed that the questions of fact and law be tried by the court without a jury. "The court having heard the pleadings, * * * and all the evidence of the respective parties having been introduced, documentary and written, as well as parol, and the evidence having been concluded, on this, the 31st day of March, A. D. 1903," the court rendered judgment, reciting therein substantially as follows: (1) That the land in controversy is a part of 11 leagues that were granted to William Hardin, as attorney of Jose Dolores Martinez, by the Mexican government, on the 28th day of November, A. D. 1833; (2) that the plaintiffs are the heirs and legal representatives of William Hardin, deceased, and hold whatever title to the land in controversy that was acquired by William Hardin during his lifetime; (3) that the several instruments and muniments of title which were introduced in evidence by the plaintiffs, and duly considered by the court, show that the equitable title to said land was in William Hardin at the date of his death, and descended and passed to the plaintiffs in this case as his legal representatives; (4) that the muniments of title introduced in evidence and duly considered by the court are sufficient, in the opinion of the court, to pass the title to the land in controversy in this suit to William Hardin, and therefore sufficient to pass the title to the plaintiffs herein, but that the plaintiffs do not hold the legal, as distinguished from the equitable, title to said land. Other conclusions are noted which we do not deem it necessary to recite. The judgment then proceeds:

"Upon the foregoing findings of fact and conclusions of law, the court is of the opinion that because the plaintiffs possess and hold only the equitable title to said lands, and because this is a court of law and not of equity, and because the equitable title cannot be heard and determined in this court in this cause, as presented, it being a case at law and not in equity, that the plaintiffs are not entitled to recover, and that judgment should be given for the defendants."

The assignment of errors presents six specifications, but to the single effect that the court erred in its conclusions that the plaintiffs do not hold the legal, as distinguished from the equitable, title to the land.

On the 30th of August, 1830, Jose Dolores Martinez, a Mexican residing at Nacogdoches, Tex., in the then state of Coahuila and Texas, petitioned the Governor of that state to concede him by way of sale 11 leagues of land, and on March 16, 1831, the Governor granted under sale to the petitioner the 11 leagues of land which he solicited, using the customary forms, not necessary to be recited. On September 7, 1832, the citizen Jose Dolores Martinez, Adolphe Sterne, and Charles Taylor appeared before the proper officer at Nacogdoches, and declared that the party of the first part agreed to sell to the parties of the second part 11 leagues of land, which he had acquired by means of a purchase from the aforesaid Supreme Governor, being a grant executed in his favor dated the 16th day of March, 1831, and to transfer in their favor the corresponding document as soon as he has obtained formal possession of same; and the parties of the second part bind themselves to make the following payments:

"First, they bind themselves to observe all the requisites expressed in said grant, such as making payments to the government in conformity with the law of colonization to which it is subjected to establish same, cultivated in accordance with said law, and to incur all necessary expenses in order to obtain the aforesaid possession, relieving the grantor and assuming on their own account and risk all the requirements to which the aforementioned grant is subject; and, in order that said agreement may be binding, the said Jose Dolores Martinez agrees and promises that he will sell to the said Adolphe Sterne and Charles Taylor for the period mentioned, the said 11 leagues of land for the above stipulated considerations, and the further sum of Two Hundred Dollars, and that he will not sell the said land to any other person although he may be offered more for it, and that he will execute in their favor a corresponding instrument in accordance with this contract of sale, he receiving from them in my presence as a sign or pledge, the sum of Two Hundred Dollars to him paid to his entire satisfaction, hereby promising not to retract from said contract or agreement, and should he do so, he will return to them the Two Hundred Dollars which he has just received and as a penalty shall pay Eleven Thousand Dollars with costs, damages. Both contracting parties concede that this contract is perfectly executed and renounce all laws in their favor, especially that which says that the contracting parties about to execute a sale may repent; equally those which prefer the four year contract or extension of same under a plea of ignorance of value; and the contracting parties herewith make a gift, perfect and irrevocable, to each other, of the surplus value of the same, themselves renouncing all laws or privileges which may be in their favor. And signing said contract they bind themselves to observe all its forms, empowering the judges of whatever jurisdiction they may be and especially those of this town, to enforce the fulfilment of same, subjecting themselves in the event that they should forfeit the same, to all the severity of the laws, as if sentence had been passed upon them."

On the 14th day of April, 1833, before the proper officer, in the town of San Felipe, of Austin, Adolphe Sterne, a resident of the town of Nacogdoches, personally known to the officer, appeared and declared:

"That whereas the citizen, Jose Dolores Martinez, by public writing, dated Sept. 7, 1832, in the town of Nacogdoches before the citizen, Jose MaMora, only judge of said town, obligated himself to the grantor and *his partner*, the citizen, Charles Taylor, to sell the 11 leagues of land which he had by means of a sale from the government of the State, through his grant of March 16, 1831, executing in his favor the corresponding instrument as soon as he should

obtain possession thereof in form, and, whereas, and in consideration of which, the citizen, William Hardin, has delivered to the grantor One thousand dollars, which he confesses having received to his satisfaction, upon which he renounces the laws of non numerata pecunia, does not deliver and prove, but agrees that the said Sterne, for himself and *his companion the said Taylor*, trespasses and transfers to the said Hardin said writ of sale, with all its obligations, rights and actions, which it is expressed by both parties, and the grantor for himself and *his aforesaid companion*, places and substitutes the said Hardin in his stead, with all his obligations, rights and actions, and confers upon him absolute power and as sufficient as by right is required, so that he may act and receive for him judicially and extra-judicially, and if necessary to appear in court, and even to secure the fulfillment of the herein mentioned writing, that he may ask, act and certify and labor practically for the grantor, his said partner and for himself, without restriction in all tribunals, superior and inferior, to dispose of the eleven leagues of land at his own discretion, conferring upon him the absolute power which he needs, with a free, frank and general administration, incidents, dependencies and annexes, having the power to substitute him when and whenever occasion demands, revoking any and all substitutes, he conveys to him all his title, real and personal, useful, mixed, direct, executive and others, to which he has a claim and which he can convey; he constitutes him acting attorney for his own cause and business, placing him in his stead, degree with subrogation in legal form, and delivers unto him in my presence, to which I certify, the original writing of obligation, in order that he may use same in connection with this grant as he may deem proper, declaring that it is certain that he has not conveyed nor transmitted same, and hereby obligates himself not to transmit or deliver same, or to revoke this transfer, totally or partially, and should he do so, wishes same not to be valid in court, hereby approving and ratifying same.

"[Signed]    Adolphe Sterne,
"For Himself and *His Partner*."

At Nacogdoches, on November 11, 1833, William Hardin presented himself to the commissioner, Vicente Aldrete, by writing, in the following words:

"Mr. Commissioner Citizen Vicente Aldrete: Wm. Hardin, a citizen of the Village of Liberty and residing in this town before you would present myself and say that as appears by the testimonio which duly accompanies on two necessary leaves, the Supreme Government of the State conceded to the citizen Dolores Martines, on the 16th of March, 1831, eleven sitios of land, on the vacant lands of the state, and in class of purchaser. In view thereof, and in the name of said Martines, representing him as substituted by Mr. Adolfe Sterne, attorney of said Martines, which appears by the accompanying document which I pray you may return to me for the proper uses, I pray that you may be pleased to order that there be surveyed to me the aforesaid eleven sitios of land upon the margins of the Trinity river on the vacant lands that may be found there, issuing to me the corresponding title or titles to give me the possession of the aforesaid sitios to protect the right of the party I represent, in all of which I shall receive justice; it being what I ask."

Thereupon the commissioner made the following order, namely:

"By being presented and admitted in the most proper form of law, with the accompanying documents, let the documents asked for be returned to the party, and this will pass to the surveyor, Citizen Jose Maria Carbajal, that he may make the surveys of the eleven sitios that the party solicits on the indicated lands, and he will proceed in entire conformity with the laws, and the notes and maps that he may form of them he will remit to me, that in view of them I may proceed in a proper manner. Thus I determine and sign with two assisting witnesses, according to the law.

"[Signed]    Vicente Aldrete."

And thereafter, on November 28, 1833, the commissioner authorized "to give possession to various Mexicans, who by sale have lands conceded to them by the same supreme government in the Department of Texas," duly passed the final instrument of possession, using in part the following language:

"Inasmuch as the citizen Jose Dolores Martinez has conceded to him by the Most Excellent Sir Governor eleven leagues of land in class of purchaser, according to an order dated the 16th of March, 1831, which his attorney in fact, William Hardin, has presented. In the name of the State I concede to, confer upon and put him in effective and personal possession of eleven leagues of land upon the Trinity river [describing the land, its classification, etc.]. Therefore, using the powers granted me in virtue of my commission, by the law and consequent instructions, I issue the present title and command that testimonio [first certified copy] of it be taken and be delivered to the interested party, in order that he may possess and take the benefit as his own of the eleven leagues, which have been granted to him as a purchaser, he, his children, heirs and successors, or whoever of him or of them may have cause or may represent action or right, this being the will of the state."

We assume that the Circuit Court concluded as it did with reference to the jurisdiction of that court sitting at law to adjudicate the issues between these parties upon the authority of Fenn v. Holme, 62 U. S. 481, 16 L. Ed. 198. We quote from the opinion in that case:

"The inquiry then presents itself as to who holds the legal title to the land in question. The answer to this question is that the title remains in the original owner, the government, until it is invested by the government in its grantee. This results from the nature of the case, and is the rule affirmed by this court in the case of Bagnell et al. v. Broderick [13 Pet. 436, 10 L. Ed. 235], in which it is declared that Congress has the sole power to declare the dignity and effect of titles emanating from the United States, and the whole legislation of the government in reference to the public lands declares the patent to be the superior and conclusive evidence of the legal title. Until it issues, the fee is in the government, which, by the patent, passes to the grantee, and he is entitled to enforce the possession in ejectment."

In this case there is no question as to the full title having passed from the government to its grantee. The substantial question between these litigants seems to arise out of a difference as to the sound construction of the writing executed by Jose Dolores Martinez on the 7th of September, 1832, the question being, does that writing evidence an act of sale, or a letter of attorney with a promise to sell? When this instrument was offered in evidence, in connection with plaintiffs' other offerings, the defendants, by their counsel, objected to its introduction, specifying as one ground of their objection that this instrument "in which Jose Dolores Martinez agreed to convey his interest and title to his concession to eleven leagues of land from the Mexican government was an executory contract, and was only a promise to convey, and did not convey the legal title to said concession, and only conveyed, if anything, equitable title, and therefore could not be admitted in evidence in the United States court sitting at law."

Titles issued to purchasers under the laws of the state of Coahuila and Texas had annexed to them—except such as were granted to the military and some other favored persons—conditions, upon the nonperformance of which the titles were subject to forfeiture, but until which the fee was in the grantee. These titles conveyed all the estate and interest which the government had to convey as absolutely as did

the final act of consummation by the Spanish government after the performance of the conditions. No such act of confirmation of the government was required or was contemplated by the colonization laws; but, when the title of possession issued, the government had done the final act on her part. Nothing remained to be done to consummate the title of the grantee, who was thereby invested with the legal seisin of the land in fee. Hancock v. McKinney, 7 Tex. 452.

In Hunnicutt v. Peyton, 102 U. S. 361, 26 L. Ed. 113, it is said:

"It has repeatedly been decided in Texas that purchasers under the twenty-fourth article of Mexican Laws of 1825 can alienate their grants as soon as the concession has been made to them, before the land was selected, or the title of possession was issued [citing Ryan v. Jackson, 11 Tex. 391; Clay's Heirs v. Holbert, 14 Tex. 189]. In Martin v. Parker, 26 Tex. 254, it was held that a formal act of sale by the original grantee, with a power to the purchaser to obtain the title of possession, must be held to constitute the purchaser the absolute owner of the property, when he is put into possession of the land and the evidence of title by the proper officer of the government."

Turning to the case in 26 Tex., as referred to above by Mr. Justice Strong, we give more fully the substance of the language used by Chief Justice Wheeler in that case. He says:

"At the time of the acquisition of the title by Reynolds, the common-law distinction between legal and equitable titles did not obtain. Before the deed in question was executed, Reynolds received a power of attorney from Manchaca to apply for and obtain the title of possession. Repeated decisions of this court have settled that those who acquire land by purchase under the twenty-fourth article of the colonization law of the 24th of March, 1825, could sell as soon as the grant was obtained, and before the title of possession was issued [citing Ryan v. Jackson, 11 Tex. 391; Clay's Heirs v. Holbert, 14 Tex. 191; Fulton v. Duncan, 18 Tex. 34]. A power to apply for and obtain the title and sell, the attorney being required therein to take upon himself the ·fulfillment of the obligation and requirements of the law, has been considered as evidencing a sale, valid under the colonization law. [Ryan v. Jackson, 11 Tex. 391.] Here there was a formal act of sale with power to obtain the title of possession. This, we think, must be held to constitute the purchaser the absolute owner of the property, when, under the power conferred, he came into the possession of the land. The vendor, having authority to sell, expressly conferred by the law, it must, we think, be held that the act of sale operated to pass the title in full and absolute property to his vendee, when the latter was put in possession of the land and evidences of title by the proper officer of the government."

It appears from the report of the case of Manchaca v. Field, 62 Tex. 135, that on the 16th of March, 1831, Jose David Sanches applied to the Governor of Coahuila and Texas for a concession of 11 leagues of land under the twenty-fourth article of the colonization law of March 24, 1825. Concession was issued March 18, 1831. The final title to 10 leagues (of which the lands in controversy were a part) was extended in the name of Jose David Sanches on the 3d of October, 1833. On November 22, 1831, Sanches executed to one Jose Penida an instrument which empowered Penida, as his attorney, to take possession of 10 of the 11 leagues, to which he was entitled under his concession, and to hold and alienate the same as his own property, Sanches undertaking to abide by and ratify the acts of Penida, done under the authority so conferred. On the 9th of July, 1832, Penida indorsed this instrument to one Frost Thorn, to whom he grants and conveys all the powers

conferred on him by the instrument, designating it as a power of attorney. On the same day Penida executed to Thorn a bond reciting the payment of $50,000, and binding himself under a penalty in a like amount to convey to him 10 leagues so soon as he, Penida, should have complied with his obligation to the government and obtained possession of the land. The final title was extended on the 3d of October, 1833. It is issued in the name of Jose David Sanches, and recites that the grant is made on the application of his attorney, Frost Thorn, who is put in possession of the land. The court held that the instrument executed by Sanches to Penida, though in form a power of attorney, was in effect a sale of the concession, and that by the indorsement of the instrument by Penida to Frost Thorn, and the contract to convey to him, the superior title to the concession and to the land, when granted, was vested in Thorn.

It will be observed that these transactions occurred substantially in the same period covered by the muniments of title evidencing the Jose Dolores Martinez grant, namely, between the 30th of August, 1830, and the 28th of November, 1833. A closely analogous question, if not substantially the same, arose in the case of Gainer v. Cotton, 49 Tex. 101. We quote from the opinion the following language:

"The doctrine which appellants attempt to invoke and apply to it [the instrument] springs from and has no foundation save in the technical distinctions of the common law between legal and equitable titles. But the bond from Gainer to Love is not a common-law instrument. It was made before the introduction of the common law as the rule of decisions in Texas. If, by the bond, any right to or interest in the land vested in Love, it was not a mere equity, which might become stale or be lost by his failure or neglect to assert it, or to demand some other character of conveyance. The purchase price being fully paid, and the sale being absolute and unconditional, so was Love's title. * * * This being the nature of the contract at the date of its execution, it was not affected or changed by the subsequent introduction of the common law, with its technical distinctions between legal and equitable titles." Citing Hanrick v. Barton, 16 Wall. 174, 21 L. Ed. 350.

In the case just cited by Judge Moore (Hanrick v. Barton, 16 Wall. 174, 21 L. Ed. 350), Judge Bradley uses this language:

"This being the law of Texas when the deed was executed, it was sufficient in form and mode of execution to pass a perfect title at that time from La Serda to the grantee, for it is well settled that, if a title once becomes vested, no subsequent change of laws as to forms or solemnities of conveyance will divest it."

The defendants contend that Hardin in no event acquired more than Sterne could convey; that the contract made by Martinez was with Adolphe Sterne and Charles H. Taylor; that Sterne alone contracted with Hardin; that the contract was not made with them as partners, and that there is no evidence in the record that they sought to acquire this land as partnership property, though there is some evidence that they were partners as merchants; that, in the contract of conveyance, he, in the body of the instrument, speaks of Taylor as his companion, and, though the word "partner" is used after Sterne's signature, it must have been used in the sense of companion or co-owner; but, if he is to be understood as saying that they bought this claim as partnership property, this is only a self-serving act of Sterne, a declaration in his own interest, and cannot be accepted as evidence of the fact.

In this connection we observe: The language of the conveyance to Hardin, and Adolphe Sterne's signature thereto, set out in the foregoing part of this opinion, bearing on the point here presented, we have marked by italics. This instrument and the writings to which it refers were presented to Vicente Aldrete, the commissioner, authorized "by the supreme government of the state to give possession to various Mexicans, who by sale have lands conveyed to them by the same supreme government in the department of Texas"; and he, in the instrument in which he concedes possession of the lands, recites that the order of the Most Excellent Sir Governor, dated the 16th of March of the year 1831, by which was conceded to Martinez 11 leagues of land, was presented to him, the commissioner, to extend possession, by the attorney in fact, Citizen William Hardin.

We do not deem it necessary to canvass the merits of the respective translations of the Spanish writing which put the grantee of these lands into possession and completed the title thereto; nor do we canvass with critical nicety the relations of the pronoun which is made the subject of learned argument by the respective counsel in this case. It appears sufficiently clear to us, as it evidently did to the learned Circuit Court, that the attorney in fact was the party in fact who was put in possession of the land in question by the public act of the commissioner, Vicente Aldrete. It was this commissioner's duty to inquire into and pass upon the authority of Hardin to represent Martinez as his attorney in fact. Being on the spot where the transactions were had, and at the time when they were current, his opportunity and means for arriving at a correct decision in reference thereto was ample, and superior to any we now have.

The counsel for the defendants admit that there is in the record some evidence that Adolphe Sterne and Charles Taylor were partners as merchants. We may add there is some evidence that they were merchants after the fashion of those early times, dealing in general merchandise of every description then and there in use, and dealing likewise, in connection with their general trade, in lands, which were, perhaps, then the largest element of commerce in Texas. Most of the Mexicans then resident in Texas, and most of the American colonists, had lands in larger or smaller quantities, and had little else in which to deal, or with which to barter for other things they might need or want. If, in this connection, we may be permitted to refer to Gainer v. Cotton, supra, we learn therefrom that on July 26, 1836, Adolphe Sterne was a judge of the first instance for the jurisdiction of Nacogdoches, and that on the 12th of March, 1838, Charles Taylor was the chief justice of that county. We think it sufficiently appears from the evidence in this case that Sterne was the elder, probably much the elder, of these two, that Taylor was a brother-in-law of Sterne, and that Sterne was the active manager of their business in the years 1831, 1832, and 1833. There is nothing appearing on the face of the papers in this case, or in the proof, or in the known history of the times, to negative the assumption or presumption that Sterne acted in this transaction with the knowledge and consent and authority of Taylor. In this connection it is to be remembered that the Spanish civil law, which was in force in Texas at the time, recognized verbal, as well as written, grants to land.

Manchaca v. Field, 62 Tex. 141. In Landry v. Martin et al., 15 La. 10, the Supreme Court of Louisiana, after mature consideration, decided that the Spanish government recognized verbal, as well as written, grants to land. Herndon v. Casiano, 7 Tex. 335. On this subject we make the following excerpts from the opinion of Mr. Justice Brown, in the case of the Maxwell Land Grant Company v. Dawson, 151 U. S. 586, 14 Sup. Ct. 458, 38 L. Ed. 279:

"The question whether an oral transfer of land was recognized as valid by the law of Mexico was not argued upon the hearing of this case, and may be open to some doubt. There appears to be a diversity of opinion upon the point. Upon the one hand, the Supreme Court of California, which state also inherited the civil law from Mexico, has uniformly held that a conveyance of land resting solely upon parol was void by that law [citing and commenting on the California cases].

"It will be observed in this connection, however, that the court [California court] relies largely upon the extract from the Recopilacion, which appears to have embodied a system of laws applicable to all the Spanish possessions in the Indies. The law referred to seems to have been a mere fiscal regulation, designed for the purpose of securing to the government its alcabala or excise tax upon the transfer of land, rather than for the protection of the parties to such transfer. * * * From Schmidt's Civil Law of Spain and Mexico, published in New Orleans in 1851, * * * it would appear that no distinction was made between personal and real property. * * *

"It is also said, in the useful and exhaustive work of Mr. Hall upon Mexican Law (page 489), that there was no statute of frauds in Spain or Mexico, and that a verbal sale of real estate was valid. He also speaks of the public writing (escritura publica), stated by earlier authors to be essential to the sale of real estate, as being a mere fiscal law, created for the purpose of collecting the alcabala, or tax, on sales, and that the law did not declare that sales made otherwise should be null and void."

It might be that, if this contention of the defendants were sound and carried to its ultimate effect, it would touch the vitals of the original grant itself, the validity of which neither of the parties to this suit questions. In Gonzales v. Ross, 120 U. S. 626, 7 Sup. Ct. 716, 30 L. Ed. 801, the Supreme Court uses this language:

"The extension of title by the commissioner, in these Mexican grants, completed the title without any patent or other act of the government, and notwithstanding the imposition of conditions subsequent."

The court then cites, with distinct approval, the case of Hancock v. McKinney, supra.

Applying the language of the Supreme Court in Hunnicutt v. Peyton, 102 U. S. 360, 26 L. Ed. 113, to the case before us, we are unable to see why the proceedings herein done did not vest the legal title to the lands granted in William Hardin. The possession was delivered to him, and he was instituted therein. The interest of Martinez, whatever it was, both legal and equitable, had been sold by him to Sterne and Taylor, and they had sold it to Hardin. The institution into possession must, therefore, have inured to the benefit of Hardin. It is a mistake to allege, as the defendants now do, that the final extension of title was to Martinez. It may be that Hardin would have held the land for the use of Martinez, had he been only the attorney of Martinez, but he was more. He was a grantee of all the Martinez right.

Although the judgment of the Circuit Court was in favor of the defendants, they have sued out a cross writ of error, and complain of certain adverse rulings sustaining objections to the introduction of the evidence of certain witnesses called on their behalf in support of their pleas of the statute of limitations, which rulings the defendants, in anticipation of a possible new trial, desire to now have considered and corrected in this court. As the rulings in question, if erroneous, have wrought no hurt to the defendants, the occasion has not arisen for us to pass upon them.

The judgment of the circuit court is reversed, and the case is remanded with directions to award a new trial.