## ALLEN et al. v. PARMALEE et al.

### (Circuit Court of Appeals, Fifth Circuit. January 2, 1906.)

### No. 1,449.

1. PUBLIC LANDS—MEXICAN GRANT—ACT OF SALE—CONSTRUCTION OF INSTRUMENT.

In 1830 a grant of lands in sale was made by the governor of the Mexican state of Coahuila and Texas to a Mexican officer pursuant to law, such lands, to be located in the vacant lands of the department of Nacogdoches in the place or places which might best suit the interests of the grantee. In 1831 the grantee executed a power of attorney to locate such lands to Frost Thorn, and two days later executed an act of sale to Thorn. In 1832 Thorn duly executed an instrument which appears as a part of the aforesaid power of attorney, in which he declared: "I have substituted and do by these presents substitute citizen Andres Dexter as my attorney with the same faculties hereby granted him that I as attorney hold." Immediately thereafter Dexter applied to the proper authorities of Nacogdoches for a location and survey of the grant, and obtained an instrument of title vesting in him and his heirs and successors title and possession of the lands so selected and surveyed. On Dexter's death in 1837 such lands were distributed as a part of his estate to his heirs, who, with their subsequent grantees, have continued since to notoriously claim the same and to pay taxes thereon. Thorn was a prominent citizen of Nacogdoches from about 1822 until his death in 1854. He had large dealings in lands and left a large estate, which was administered by men fully acquainted with his business affairs, and who had been associated with him in his land transactions. It did not appear that Thorn in his lifetime ever made any claim to the lands granted to Dexter. They were not administered as a part of his estate, and it was shown that neither his administrators nor his heirs during many years after his death made any claim hereto. *Held,* that the instrument executed by him to Dexter must be construed as an act of sale, and not merely as a power of attorney, he being at the time the owner of the grant, and that its effect supplemented by the subsequent conveyance made pursuant thereto was to vest title to the lands selected in Dexter.

2. WRIT OF ERROR—REVERSAL—REMAND.

In an action of trespass to try title to which there were numerous parties each claiming parts of the tract in dispute, on the close of plaintiff's evidence motions for a directed verdict were made by both plaintiffs and defendants, and the motion by defendants was granted. On appeal it was determined that such action was erroneous, and that on the record the motion of plaintiffs should have been granted. *Held,* it appearing that separate and affirmative defenses were pleaded by certain of the defendants, which had not been tried, that the court would not render judgment for plaintiffs, but would remand the case for a new trial.

In Error to the Circuit Court of the United States for the Southern District of Texas.

John M. Duncan and A. C. Bullitt, for plaintiffs in error.

Frank Andrews, H. M. Garwood, and W. L. Hill, for defendants in error.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

McCORMICK, Circuit Judge. This was the Texas statutory action of trespass to try title to land. The pleadings are formal. It was originally brought by certain of the plaintiffs in error and the others of the plaintiffs in error came into the action on leave as interveners. During the trial the following agreement was had:

"It is agreed among the plaintiffs, defendants, and interveners and their counsel, in open court, that plaintiffs and interveners have such title to the land in controversy as was in the original Andrew Dexter at the time of his death; he being the same Dexter whose estate was administered upon in Nacogdoches county, Texas, as shown by the probate proceedings in that county heretofore introduced in evidence by plaintiffs and interveners, and such title as was in Andrew Alfred Dexter and Charlotte S. Dexter, in 1843, at the time of their contract with Wade Allen, heretofore introduced in evidence, and that plaintiffs have such title as was in the original Wade Allen and Thos. H. Watts. Further, that if plaintiffs and interveners shall be entitled to a recovery on this trial in this case that the plaintiffs will recover an undivided one-half of the land in controversy and the interveners an undivided one-half."

In this opinion the distinction between plaintiffs and interveners will be dropped, and those parties will be called plaintiffs. The plaintiffs introduced a duly authenticated translation from the Spanish archives in the general land office of the state of Texas, beginning with a document marked "N 1," which in its material part is as follows:

"In the town of Nacogdoches and on the twentieth day of the month of August, one thousand eight hundred and thirty-one, before me, citizen Manuel de los Santos Coy, only constitutional alcalde of the aforesaid town and instrumental witness, who will be hereinafter named, besides my witnesses of assistance with whom I act in conformity with law, appeared citizen Jose Ortega, captain of the 12th battalion permanent, which is now guarding this frontier, in person, whom I certify that I know, and declared: That by these presents he grants and confers all his power, full, complete and sufficient to the extent required by law and with such degree of validity as may be necessary, unto the citizen Frost Thorn of this neighborhood, especially in the representation and exercise of the rights and actions accruing to the grantor to solicit, of the person or persons appointed for the purpose, the possession of eleven leagues of land which he acquired by purchase from the supreme government of the state, with the privilege of selecting them in the place or places which he may deem most suitable, together or in separate tracts, according to the tenor of the concession, dated the twenty-third of September, one thousand eight hundred and thirty, which I certify having seen and which the grantor delivered to his attorney to do and exercise in the name of the grantor all that he could do if present, in as much as for all the aforesaid and everything annexed dependent, pertaining or incident thereto he grants and confers upon him the most full and extensive power, without limitation whatever, and so that the absence of no stipulation or requisite not herein expressed shall prevent this power from having all the effects for which it is intended, in as much as whatever the same may be, he gives it as herein inserted as if it were literally written, that he can name substitute, revoke them and choose others anew, with free, full and general administration in as much as he relieves them all in so far as the law permits; and to adhere to and consent to everything done by his attorney by virtue of this power he duly binds himself and all his property and renounces the laws in his favor."

As part of document No. 1 the following also appears:

"In the town of Nacogdoches, the sixteenth day of November, one thousand eight hundred and thirty-two, before me, citizen Jose Maria Mora, only constitutional alcalde of the aforesaid town, personally appeared citizen Frost Thorn, with whom I certify I am acquainted, and declared: 'I have substituted, and do by these presents substitute citizen Andres Dexter as my attorney with the same faculties hereby granted him that I as attorney hold.'

"In testimony whereof he signed with me and witness of my assistance. I certify. Frost Thorn."

The other authenticating signatures we omit.

This is followed by a document No. 2, containing the application of Jose Ortega for a grant to him in sale conformably to article 24 of the colonization law of Coahuila and Texas of March 24, 1825, for 11 leagues of land in the vacant lands of the department of Nacogdoches in the place or places which may best suit his interest, with the privilege of selecting them together or in separate tracts, etc., and on it is indorsed the order granting the concession, as follows: ,

"Conformably to article 24 of the colonization law of March 24, 1825, I grant in sale to the applicant the eleven leagues for which he applies in the vacant lands of the state in the place which suits him best, after a sufficient quantity for the payment of what the states owe the federation, has been selected by the commissioners of the supreme government. The constitutional alcalde of the municipality, to which the aforesaid land belongs, will put him in possession of said leagues, and issue the corresponding title, ascertaining beforehand their classification to determine what should be paid the state, for the payment of which I grant him the terms granted by article 22 of the aforesaid law. A copy of which application and this decree will be given by the secretary to interested party that he may proceed with it to the commissioners to secure the effect desired and consequent."

As a part of this document No. 2 appears an act of sale by Jose Ortega to Frost Thorn in which he (Ortega) invokes the right conceded to him by article 27 of the state colonization law, and acknowledges that he confers and grants in real and public sale as a property right (heritage), forever unto citizen Frost Thorn of this neighborhood, the following, to wit (describing the concession), under the same conditions, privileges, and obligations imposed upon the grantor for possession and title, of which the same purchaser holds a special power conferred the 20th day of the present month, and for the consideration of $5,000, the purchaser to pay the cost of the survey, the commissioner stamps for the issuance of title and the rights of the state to the value of the lands, in accordance with their price and according to law, which expenses are to be regarded as an augmentation of the price above stated for which the concession named was sold, with the customary covenants then in general use in such transactions. This act of sale is dated August 22, 1831. Immediately after this document No. 2 comes the application of Andres Dexter:

"To the Only Constitutional Alcalde: I, Andres Dexter, citizen of the town of San Felipe de Austin, and now a resident of this town, without prejudice to my legal rights, with respect represent, that conformably to the judicial power with which the necessary oath accompanies under No. 1, I am the attorney substitute for citizen Frost Thorn, of this neighborhood, to apply for and obtain possession of and title to eleven leagues of land which was acquired from the supreme government of the state by Captain Jose Ortega, as evidenced by the document of concession dated twenty-third of September, one thousand eight hundred and thirty, which is also joined with proper solemnity under No. 2, and as one of the clauses contained in the aforesaid power, with reference to the concession, authorizes the interested party to select the lands together or in separate tracts, provided they are entirely vacant, it suits my interest that their location be made on the east bank of the Trinity river in any place suitable. To that end I pray you to dictate the conducive decrees as commissioner of the supreme government appointed for this case and according to the tenor of concession, document No. 2, to have the lands measured, surveyed and delineated by an apt surveyor and a corresponding title

issued me as the record directs, in as much as I guarantee all the costs and swear to the necessary, etc.

"Nacogdoches, 17th of November, 1832.

"Andres Dexter."

Thereupon the proper action was taken by the constitutional alcalde of the municipality to which the land belonged to put Andres Dexter in possession of the leagues embraced in the concession and issue to him the corresponding title. The alcalde recites in the title which he gave the interested party that:

"I grant, convey and put citizen Andres Dexter in real and personal possession of two leagues of land [the land involved in this case] as substitute attorney of citizen Frost Thorn. * * * I issue the present instrument and order that a certified copy of this decree, with a map of the land made by the surveyor of the land attached, be transcribed and handed to the interested party that it may serve him as a title of property, that he may possess and enjoy the land for himself, his children and successors, or whoever of him or them cause or right may have, on condition that no one shall dispossess them of the lands, except they first be heard and overcome in court."

The town of San Felipe de Austin was the capital of Austin's colony. Andres Dexter in his application, which is quoted above, recites that at the date thereof he was a citizen of the town of San Felipe de Austin and now a resident of this town (Nacogdoches). Andres is the Spanish form of the name Andrew. On January 17, 1838, Thos. J. Rusk and Geo. W. Grant applied to the probate court for Nacogdoches county for letters of administration upon the estate of Andrew A. Dexter, alleging that he (the deceased) was "late of the state of Alabama and of the United States of America," and that he died in or about the month of September, 1837, "owning at the time of his decease land and other property in the county of Nacogdoches, Texas, and other parts of the republic." Administration was granted to them, and having duly qualified they, with the help of appraisers who had been appointed by the court, rendered to the court on June 17, 1839, an inventory of all the property of which Andrew Dexter died seised and possessed which had then come to their knowledge, giving specification of grant and valuation, as follows:

Five leagues of land situated on both sides of the Angelina river in Nacogdoches county, originally granted to Jose Ma Musquez, 22,140 acres, 50 cts.............................................$11,070 00

Eight leagues of land located on both sides of the Trinity river and lying in Houston and Montgomery counties, originally granted to Gordiana Badillo, 35,428 acres, 50 cts........................ 17,712 00

Six leagues of land located on both sides of the Trinity river in Houston and Montgomery counties, originally granted to Jose Ma Musquez. These six leagues stand in the name of Frost Thorn, H. H. Edwards and Charles Taylor, 26,568 acres, 50 cts........ 13,284 00

Eleven leagues of land located on both sides of the Trinity river in Houston and Robinson counties, originally granted to Simon Sanchez, 48,708 acres, 50 cts................................. 24,354 00
These eleven leagues also stand in the name of the above named Thorn, Edwards, and Taylor.

Also four leagues of land located on the east side of the Trinity river in Houston county, originally granted to Jose Ortega, 17,712 acres at 50 cts............................................. 8,856 00

$75,276 00

Three days later the administrators filed their final account, itemized as follows:

(1) To cash paid J. Albright recording deeds.......................$ 45 67
(2) To do pd. J. Corrieve translating, etc........................... 8 00
(3) To do pd. D. C. Brock for sundry expenses incurred in surveying
     lower  T.  tracts.......................................... 96 00
(4) To do pd. W. C. Brookfield, D. S., for surveying upper and lower
     Trinity  tracts  ......................................... 288 75
(5) To do. G. G. Payne for surveying dividing leagues............. 36 50
     To pilots to show lines of land............................... 4 00
(6) To hands in surveying No. 6................................... 34 00
(7) To C. H. Nelson in finding lines............................... 9 00
     To Brimberry for blazing lines and board bill................. 30 00
     To Melton & Cook expenses surveying (board)................ 6 00
(8) To E. Collard, 3d instalt. on Gordiana Badillo................. 302 77
(9) To E. Collard, 1st and 2nd instalts. on same by C.............. 607 54
(10) To I. H. Kirchhoffer 1st and 2nd instalts. on Sanchez grant (C). 796 00
(11) To I. H. Kirchhoffer 1st and 2nd instalts. on Jose Ortega (C).... 305 55
(12) To do. for 3rd instalts. on Jose Ortego...................... 152 78
     To cash General Land Office for copies of deeds................ 20 00
     To recording Roberts deed to Sanchez......................... 2 00
     To sundry board bill and expenses as per receipts Nos. 13 to 19,
     Geo. W. Grant and horse keeping.......................... 208 42
     To Hunter & Clapp, 1839, expenses G. W. Grant and his horse.. 42 25
     No. 20 Sundry bills of expenses boarding in the City of Houston,
     March and April, 1839, G. W. Grant......................... 34 25
     Paid Notary Public ....................................... 2 00

                                                             $3,031 98
     To 2½ upon amount paid out............................. 82 99

                                                             $3,114 97
     Clerk's fees............................................... 7 37
     Chief Justice Commission per cent. etc., as per receipt........ 35 94

                                                             $3,158 28

                               Contra Cr.

By cash received from A. A. Dexter to be expended for bene-
     fits of estate, sundry items, viz:
By mail ...................................................... $ 217 50
Through James Clark..................................... 3,076 70

                                                             $3,294 20

This account was approved by the court. With it was filed the following:

### "Final Receipt of Heirs.

"Republic of Texas, county of Nacogdoches:

"Know all men by these presents that I, Andrew A. Dexter, of the state of Alabama, in the United States, at present of the county and republic aforesaid, for myself and as attorney in fact for my sister, Charlotte S. Dexter, have this day received from Thomas J. Rusk and George W. Grant, administrators of the estate of Andrew and Samuel Dexter, late of the county aforesaid, decd., all the personal and real property assets, evidences of debt, etc., which have come into their hands or to their knowledge as administrators, and do hereby release and discharge the said administrators of all charges, demand or liability or accountability whatever to the heirs of the said Andrew and Samuel Dexter, decd., and the said A. A. Dexter having examined their account current of receipts and disbursements for the benefit of the said

estates and do hereby for myself and sister approve and receive the same.

"In witness whereof I have hereunto set our hands & seals this 16th day of June, 1839.

"Andrew Alfred Dexter. [Seal.]
"Charlotte S. Dexter. [Seal.]
"Per Her Attorney, A. A. Dexter."

The colonization law of 1825 on its face expresses that in the distribution of lands a preference shall be given to the military and to Mexican citizens not military. These classes were authorized to purchase not exceeding 11 sitios to one person, and such purchasers were authorized to alienate the same at any time, provided the successor—that is, the one to whom they sold—obligated himself to cultivate the same within the same term as was obligatory upon the original proprietor. New settlers, as the American colonists and other foreign colonists were called, could acquire from the government land, but not in nearly so large quantities, and were under severe limitations as to the exercise of the right of alienation. Before September 23, 1830, the date of the concession to Ortega, the new settlers in Texas greatly outnumbered the native Mexicans residing there, and the colonists had become jealous of this preference given by the laws and administration of the state to the native Mexican citizens in the disposition of public lands, and this jealousy extended to those not native Mexicans, who, under the forms which had begun to prevail, acquired these larger grants, the location of which obstructed the colonists in the location of the smaller grants which under the laws they were entitled to acquire. This jealousy grew more intense against the holders of the larger grants after the separation of Texas from Mexico and the establishment of the new government by the colonists. It does not appear what action the heirs of Andrew Dexter took after June, 1839, in connection with the landed estate devolved upon them by the death of their father, until November 11, 1843, when they contracted with Wade Allen, of Montgomery county, Ala., on the terms expressed in an instrument bearing that date, to renew and settle by purchase or compromise with the government or private individuals any conflicting liens or claims which may incumber the property, specifying the property as that mentioned in the inventory rendered by the administrators in the probate court of Nacogdoches county, as heretofore set out. The Wade Allen mentioned in this contract is the ancestor of the plaintiffs who brought the suit in the Circuit Court, and since November 11, 1843, he and his heirs and assigns, and the heirs of the original Andrew Dexter and their assigns, have given continuous, active attention, and made notorious public claim to these lands as being owned and held by them under the Andrew Dexter title. The record does not show that at any time after December, 1832, when the citizen Andrew Dexter was put in real and personal possession of the two leagues of land involved in this litigation, either he or his heirs, by themselves or by their tenants, have ever held actual pedal occupation of these lands. They have returned them for assessment of the taxes thereon and have paid the taxes through many years, and have had dealings and settlements with various parties who have attempted to locate land certificates

on them, or in any other manner to trespass on them as settlers or occupants.

The record shows that Frost Thorn came to Texas either with the first American settlers in 1822, or very soon thereafter; that he was a leading citizen of Nacogdoches; that he had intimate business relations with Gen. H. H. Edwards; that he was a large trader in general merchandise, and especially in dealings in real estate in that part of Texas; that from his first settlement in Nacogdoches until his death in December, 1854, he continued to reside at Nacogdoches and to be actively connected with Gen. Edwards and other prominent men in that section in dealings in land; that when he died he left a large estate in lands embracing several hundred thousand acres located in eastern Texas in parcels situated in 20 or more counties; that Gen. Edwards was one of the executors of his will; that Edwards and Dr. James Starr were the first administrators of his estate; these administrators were men of eminent ability and thoroughly conversant with the land business in that part of the state; that Thorn's estate devolved upon his surviving widow and their two surviving children as his legatees and only heirs; that between these the estate began to be divided in 1855; that John Durst, who was a grandnephew of Frost Thorn's wife, and who acted as agent for Frost Thorn's estate and other lands, in connection with Edwards and Starr at Nacogdoches, afterwards had charge of the estate of Thorn's widow, Susan W. Thorn, by general power of attorney, and of the estate of two of her minor grandchildren. He testifies that he knows the heirship of the Thorn family down to the present time; that the lands of the Thorn estate were very carefully looked after, after Thorn's death; that the administrators were both thoroughly competent and well-posted land men, very familiar with the Thorn estate and with its affairs and business, having been associated with Thorn, and Gen. Edwards and Thorn having bought and sold a great many lands together; that this witness' familiarity with the lands prior to the time he took charge of them resulted from his being connected with the office of the administrators; that after the minors to whom he had referred became of age he continued to look after their estates by powers of attorney; that his connection with the estate was such that he had exclusive charge, management, and control thereof with as full power as if it were his own; that while he was agent and representative of the Thorn estate he never exercised any supervision, control, or management over the Mexican grant known and referred to as the "Ortega Survey"; that he never rendered it for taxes; and that neither he as agent for the heirs, nor the administrators, ever made any claim to the Ortega survey or any part of it. There was much other testimony introduced by the plaintiffs to show their continuing assertion of claim to the land. When the plaintiffs had closed their evidence, the defendants moved the court to instruct the jury to return a verdict for them. On this motion the plaintiffs joined issue and asked the court to instruct the jury to return a verdict for the plaintiffs. After hearing argument of counsel thereon the court announced:

"I cannot get my consent to believe that the testimony offered by plaintiffs and interveners as to the power of attorney from Frost Thorn to Andrew

Dexter passed the title. It does not occur to me, that being the case, that the question of presumption would arise by reason of the fact that there has been no adverse holding and no such possession as would warrant the court in taking that view. * * * Adhering to the view that the instrument merely conferred an agency upon Dexter, I will instruct the jury to return a verdict for the defendants."

This action of the court is made the basis of the assignments of error. In our opinion it was erroneous, and requires that the judgment be reversed. The decree of the governor made on the application of Ortega grants him in sale the 11 leagues for which he applies in the vacant lands of the state in the place which suits him best, and it provides that the constitutional alcalde of the municipality to which the lands belong will put him in possession and issue the corresponding title, and that a copy of his application and of the decree thereon will be given by the secretary to the interested party that he may proceed with it to the commissioner to obtain the effect desired and consequent. Andrew Dexter, as the interested party, on November 17, 1832, made his application to the constitutional alcalde, and with his application submitted certain documents which he referred to as "No. 1" and "No. 2," on which, or in reference to which the alcalde made this note:

"Nacogdoches, December 12th, 1832. Presented and admitted as required by law, with the accompanying documents to comply with, protect and execute whatever his excellency, the governor, is pleased to prescribe for the aforesaid in his superior decree the twenty-third of September, one thousand eight hundred and thirty, as appears in the accompanying document No. 2."

And in the body of the extension of the title the alcalde, among other things, recites:

"Whereas the interested purchaser has in due form granted his power to citizen Frost Thorn of this neighborhood, and the latter has constituted Andres Dexter that in his name he may apply for and obtain possession and legal title to the mentioned eleven leagues of land, according to the tenor of the special power, which may be seen attached to this decree, under No. 1, made and authorized in due form."

On referring to these documents, which stand first in the order of their numbering in the collection of papers constituting the original title from the state of Coahuila and Texas to the grantee of these lands, it appears that document No. 1 contained the power bearing date August 20, 1831, given by Ortega to Frost Thorn, and the substitute dated November 16, 1832, given by Thorn to Andrew Dexter. And document No. 2 contained the application of Ortega to the governor, dated August 17, 1830, and the governor's decree thereon, dated September 23, 1830, and also contains the act of sale made by Ortega to Thorn, dated August 22, 1831. The power of attorney to Thorn clothes him with authority to select the lands in the place or places he may deem most suitable, together or in separate tracts, according to the tenor of the concession, which granted to the purchaser the lands for which he applied in the vacant lands of the state "in the place which suits him best." And Andres Dexter, referring to these features of the documents Nos. 1 and 2, says in his application to the commissioner:

"It suits my interest that their location be made on the east bank of the Trinity river in any place suitable. To that end I pray you to dictate the conducive decrees as commissioner of the supreme government appointed in this case and according to the tenor of the concession, document No. 2, to have the lands measured, surveyed and delineated by an apt surveyor and the corresponding title issue to me as the record directs, in as much as I guarantee all the costs and swear to the necessary," etc.

Thereupon, in due order, the necessary preliminary surveys and classification were made and Andres Dexter was put in real and personal possession of the two leagues of land as substitute for citizen Frost Thorn, and received from the commissioner the final extension of title, which final document closes thus:

"Therefore, exercising the powers conferred upon me by law and consequent instructions, as commissioner of the supreme government of the state especially for this matter, I issue the present instrument and order that a certified copy of this decree with a map of the land made by the surveyor attached, be transcribed and handed to the interested party that it may serve him as a title of property and that he may possess and enjoy the land for himself, his children, his heirs and successors or whoever of him or of them cause or right may have, on condition that no one shall dispossess them except first they be heard and overcome in court."

The evidence shows that Frost Thorn was a prominent citizen of the department of Nacogdoches, and resident in that town from a time anterior to these transactions and continuously thereafter until his death in 1854. From the recitations in Dexter's application that he was a citizen of the town of San Felipe, and from the statement of the witness Hunter that among the Dexter papers which were in his (Hunter's) possession during his agency there was a certificate to the effect that Andrew Dexter had been made a citizen of Mexico, we may conclude that he was at this time in Texas by permission of the government and in some way connected with Austin's colony. From Gen. Rusk's representation to the probate court when he asked for administration on the Dexter estate, it appears that at the time of Dexter's death in 1837 he was a citizen of Alabama. From the final account of the administrators rendered in June, 1839, it appears that the expenses of the administration amounted to $3,294.20 and had been paid in cash by A. A. Dexter, the son of the deceased. There is no evidence tending to show that Frost Thorn ever had in his possession any of the muniments of title to this land after he delivered documents No. 1 and No. 2 into the hands of Andrew Dexter on the 16th of November, 1832, and there is no evidence tending to show that either he or his heirs, or any assign of his or theirs, ever claimed any interest in these lands after Dexter was put in actual and personal possession of them by the local commissioner. On the contrary, there is abundant convincing circumstantial evidence to show that Frost Thorn never made any claim to them or any part of them, and there is conclusive direct testimony which shows that neither his administrators nor his heirs ever made any such claim.

Speaking with regard to the means of travel in Texas in November, 1832, we must note that San Felipe was then much further from Nacogdoches than the abandoned site of that ancient capital now is from the important and historic town which was then and ever afterwards

the permanent residence of Frost Thorn. For that time and place Frost Thorn was in the largest measure a man of affairs, fully equipped for procuring the extension of title for and to himself from the local commissioner. He was in Nacogdoches on the 16th of November, 1832. On that day he went before the commissioner and made the substitute power and delivered documents No. 1 and No. 2 to Andrew Dexter. On the next day Dexter made his application to the commissioner. Unless Dexter was a purchaser, these transactions are inexplicable. If the power from Ortega to Thorn, given August 20, 1831, was only a power of attorney and nothing more, evidencing that the relation thereby created between him and Thorn was that of principal and agent, its functions would have ceased the second day after it came into being by reason of the act of sale given August 22, 1831. Therefore the making the substitute by Thorn in November, 1832, more than a year after the expiration of the original power, in which Thorn declares that "I have substituted and do by these presents substitute citizen Andres Dexter as my attorney with the same faculties hereby granted him that I as attorney hold,' would be meaningless. We are unable to see why these proceedings did not vest perfect title to the lands granted in Andrew Dexter. Hancock v. McKinney, 7 Tex. 452; Martin v. Parker, 26 Tex. 254; Manchaca v. Field, 62 Tex. 135; Hanrick v. Barton, 83 U. S. (16 Wall.) 166, 21 L. Ed. 350; Hunnicutt v. Peyton, 102 U. S. 333, 26 L. Ed. 113; Surghenor v. Ranger, 133 Fed. 435, 66 C. C. A. 327.

It thus appears, in our opinion, that the Circuit Court erred in instructing the jury to find for the defendants, and that as the case then stood the court should have instructed the jury to find for the plaintiffs. The counsel for the plaintiffs in error ask us to reverse the judgment of the Circuit Court and to render judgment here in favor of the plaintiffs for the land in controversy. They urge that, if the defendants have any color of claim of title, they declined to show it when they had the opportunity and might have done so, without in any degree compromising their rights, so that the case on all of the existing facts pertinent thereto might have been adjudicated, and that to permit another trial with opportunity to introduce such evidence as they may have, if any, is to tolerate experimenting with the court by a motion to instruct without introducing evidence, and thus to bring about delay, cost, expenses, and trouble incident to two trials and two appeals, in case the judgment of this court should not be in favor of the defendants. There is much force in what they suggest, but we are not willing to go that far in this case. Beside the general issue submitted in the technical plea of not guilty, various of the defendants, if not all of them, plead the statute of limitation as to specific portions of the land. See Hodges v. Easton, 106 U. S 408, 413, 1 Sup. Ct. 307, 27 L. Ed. 169.

The judgment of the Circuit Court is reversed, and the case is remanded, with directions to award a new trial and proceed therein according to law and following the views herein expressed.